No. 12102

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

WILLIAM B. HULL,

Plaintiff and Appellant,

-vs-

NORTH VALLEY HOSPITAL,

Defendant and Respondent.

---

Appeal from:   District Court of the Eleventh Judicial District,
Honorable Robert Sykes, Judge presiding.

Counsel of Record:

For Appellant:

McGarvey, Morrison, White & Hedman, Whitefish,
Montana.
Frank B. Morrison, Jr. argued, Whitefish, Montana.

For Respondent:

Murphy, Robinson, Heckathorn & Phillips, Kalispell,
Montana.
I. James Heckathorn argued, Kalispell, Montana.

AMICUS CURIAE-Montana Hospital Assoc.
Chadwick Smith argued, Helena, Montana.

---

Submitted: February 17, 1972

Decided:   JUN - 9 1972

Filed:   JUN - 9 1972

Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is an appeal from entry of a directed verdict for defendant in a negligence action brought by plaintiff William B. Hull against defendant North Valley Hospital of Whitefish, Montana. The action was brought in the district court of the eleventh judicial district, county of Flathead, to recover damages for personal injury suffered by plaintiff by reason of the negligence of his family physician, while plaintiff was a patient in defendant hospital. At the conclusion of plaintiff's case, the trial judge sustained defendant's motion to dismiss and from that judgment plaintiff appeals.

The principals involved herein are: North Valley Hospital, defendant and respondent, hereinafter referred to as "Hospital"; William B. Hull, plaintiff and appellant; Doctor David V. Kauffman, William B. Hull's family physician; the Board of Directors of the Hospital, hereinafter referred to as "Board of Directors; and the private physicians practicing in the surrounding area who utilize the Hospital for patient care, hereinafter referred to as the "medical staff".

The Hospital is a private, nonprofit corporation operated by a Board of Directors made up of community volunteers with no paid staff of doctors or interns.

The Hospital on June 13, 1966, adopted bylaws creating a hospital structure designed to regulate the conduct of the medical staff. It was necessary to create such hospital organization to comply with the standard for hospital accreditation, more specifically the Joint Commission on Accreditation of Hospitals. In part, those bylaws are:

"ARTICLE VI        MEDICAL STAFF

"Section 1. The Board of Directors shall appoint a medical and dental staff composed of physicians and dentists who are graduates of recognized medical or dental schools, legally licensed to practice in the State of Montana, a member in good standing in

- 2 -

the local medical or dental society, and practicing in the community or within a reasonable distance of the hospital, and shall see that they are organized into a responsible administrative unit, and adopt such by-laws, rules and regulations for government of their practice in the hospital as the Board of Directors deem to be the greatest benefit to the care of patients within the hospital. In the case of the individual patient, the physician or dentist duly appointed to the medical staff shall have full authority and responsibility for the care of that patient subject only to such limitations as the Board of Directors may formally impose and to the by-laws, rules and regulations for the medical and dental staff adopted by the staff and the Board of Directors.

"* * *

"Section 4. In any case where the medical committee of the Board of Directors or the Credential Committee of the medical staff does not recommend termination of appointment, or imposes limitations with respect to the exercise of privileges requested, or where reduction of privileges is recommended, or a request for additional privileges denied, the Credential Committee of the medical staff should so notify, in writing, the physician concerned. That within ten (10) days of receipt of the above notice the physician may request, in writing, to the administrator of the hospital, reconsideration and, an opportunity to appear before the Joint Conference Committee made up of three (3) members of the medical staff and three (3) members of the Board of Directors. A decision to grant this hearing should be made within ten (10) days after the receipt of the request by the Joint Conference Committee. The Joint Conference Committee shall then, after said hearing, make their recommendation to the Board of Directors and their decision shall be final."

"ARTICLE IV          COMMITTEES OF THE BOARD OF DIRECTORS

"* * *

"Section 4. The Medical Committee shall consist of three (3) members of the Board of Directors.

"This committee shall:

    "(1)  Receive recommendations from the medical staff and make final recommendations to the Board of Directors on all appointments to, and assignments of responsibilities within, the medical staff of the hospital.

    "(2)  Recommend to the Board of Directors the types of professional work to be permitted to be done by each member of the medical staff.

    "(3)  Recommend to the Board of Directors all rules and regulations for the government of the medical staff, or amendments thereto, necessary to assure the proper care of the patients.

- 3 -

"(4)   Receive and make recommendations to the Board of Directors respecting any communications, requests or recommendations presented by the medical staff through its duly authorized representatives.

"(5)   Together with an equal number of representatives from the medical staff, constitute the Joint Conference Committee a liaison group, which, with the administrator, will discuss medical administrative matters and be the official point of contact among the Board of Directors, administrator, and medical staff.

"(6)   Receive and consider all reports on the work of the medical staff and make such recommendations to the Board of Directors in respect thereto as the committee considers to be the best interests of the hospital and its patients."

Within the medical staff itself, there are various committees including:   (1) the executive committee consisting of the president, vice-president, and secretary of the medical staff; and (2) the record review committee which regularly reviews the charts of the various doctors.   Discrepancies in the charts may either be called to the attention of the doctor responsible or, in instances requiring further action, the matter may be referred to the executive committee.   In serious matters, the entire medical staff is consulted to decide if the situation warrants disciplinary action or restriction of privileges.   In such cases, the executive committee or the medical staff would make formal recommendation to the Board of Directors.

The ultimate authority for granting or revoking privileges rests with the Board of Directors.   The administrator of the Hospital acts as the liaison officer between the medical staff and the Board of Directors.   Information relative to doctors' qualifications to have certain privileges comes from an investigation made by the medical records review committee.   Privileges extended to doctors practicing in the Hospital, subject to annual review before renewal, are:   (1) surgical, (2) medical, and (3) obstetrical.

Doctor David V. Kauffman is a licensed physician practicing in Whitefish, and during all times pertinent herein was a member of the medical staff of the Hospital.   Since 1964 or 1965, Dr.

- 4 -

Kauffman has been the family physician for William B. Hull, plaintiff herein, who in July 1969 injured his left knee when he tripped over an air hose at his automotive repair shop. On July 28, 1969, Hull consulted with Dr. Kauffman who initially treated the knee with heat treatments, but after consultation with Dr. W. F. Bennett surgery was recommended to repair the knee. On August 12, 1969, plaintiff was hospitalized at the Hospital, in Whitefish.

On August 13, 1969, surgery was performed by Dr. Kauffman and Dr. Bennett. The operation consisted of removal of cartilage from inside the left knee joint. Following surgery, plaintiff spent four days in the Hospital and was discharged on August 17. Two days later plaintiff returned to Dr. Kauffman's office to have surgical stitches removed and pus was then draining from the knee. Dr. Kauffman administered penicillin salve to counteract the draining. Plaintiff testified at trial that throughout the last two weeks of August 1969, Dr. Kauffman administered antibiotics which had no apparent effect in improving plaintiff's condition.

On September 2, 1969, plaintiff was readmitted to the Hospital by Dr. Kauffman and X ray on the knee was done by Dr. Bennett. Dr. Bennett was listed on the Hospital case records as an associate with Dr. Kauffman, and it is conceded in the record that Dr. Bennett is competent and skilled. On September 3, Dr. Kauffman, unassisted by Dr. Bennett or other medical staff, performed a second operation on plaintiff's knee. This operation was termed a "debridement".

At trial a description of the second operation was given by witness Dr. Theodore Sanford as:

> "* * * the findings: <u>stitch reaction</u>, draining infected wound. What <u>was done: the skin wound</u> was opened, all of the old stitches removed, debridement of the wound edges. Debridement means removal of dead tissue---debridement of wound edges and <u>then repaired with number thirty-two wire,</u> <u>stainless steel wire.</u> The skin was closed with four oh nylon subcutaneous, that's just underneath the skin. * * *". (Emphasis supplied)

Witness Sanford further testified that "stitch reaction" as diagnosed by Dr. Kauffman, differed from a general infection of the joint, subsequently found to be the correct diagnosis.

It was established that this misdiagnosis, treatment, or lack of proper treatment, eventually caused plaintiff's injuries. We find it unnecessary to pursue this matter in detail as plaintiff claims that defendant Hospital is liable in allowing Dr. Kauffman to practice in the Hospital. It is not claimed that any employee of Hospital was negligent in the course of treatment nor that any relationship exists between Dr. Kauffman and Hospital that would make Hospital vicariously liable for his acts.

Dr. Kauffman's negligence is admitted and the record reflects a settlement of plaintiff's claim against him prior to trial of the instant case.

The record discloses that during the 1960's and prior to plaintiff's hospitalization at Hospital, Dr. Kauffman had privileges reviewed by the heretofore described authorities of Hospital and at various times his privileges to do surgery had been revoked and then reinstated. On prior occasions Dr. Kauffman had surgical privileges with restriction, as was testified to by the Hospital administrator, Olga Torgerson. She also stated that Dr. Kauffman's privileges to do surgery were restored in 1967, but prior to that time he had been limited to minor surgery and Dr. Kauffman had acquiesced to such supervision.

Defendant's motion for a directed verdict was granted for the following reasons:

"1. That there is no statutory duty or obligation on a non-profit corporation operating as a hospital to prevent the practice of any duly licensed physician and surgeon in Montana.

"2. That the provisions pertaining to the practice of medicine under the statutory authorities and any curtailment thereof appears in Title 66, Chapter 10 of the Revised Codes of Montana more particularly known as The Medical Practice Act.

"3. That the restrictions and limitations of practice of members of the medical staff of the Defendant, North Valley Hospital, is provided by the By-laws and as applied to the evidence submitted in this case shows a complete failure on the part of the Plaintiff to establish any duty owed by the hospital to the Plaintiff as a patient thereof and any liability resulting from such a breach of duty by the hospital to the Plaintiff for the following reasons:

"A. That at the times of the alleged acts of Dr. Kauffman, he had full privileges as a member of the staff.

"B. That there was no recommendation as provided by the By-Laws for restriction of privileges of Dr. Kauffman submitted by the executive committee of the staff to the medical committee of the governing body of the hospital.

"C. That there is no showing of any receipt of such notice or request for hearing before the medical committee as more particularly provided for in the said By-Laws.

"D. That under the By-Laws and duties relating to the administrator of the hospital no such duty or obligation was imposed upon the administrator or any individual member of the Board of Directors.

"E. That any failure to submit recommendations by the credentials committee of the medical staff or the executive committee did not impose a duty upon the Board of Directors pertaining to the limitation of practice on the part of Dr. Kauffman and any liability that might have resulted there-.from."

Appellant presents a number of issues on appeal which can be reduced to two controlling issues for our discussion:

1. Was Hospital negligent in permitting Dr. Kauffman to use its facilities in ministering to his patients in light of his previous record?

2. Is the medical staff of North Valley Hospital an arm of the hospital organization and are the acts or omissions of the medical staff acts or omissions of the hospital?

Appellant states the question of duty as: "* * * whether the hospital has a duty to see that surgical privileges are extended to only those doctors who have shown an acceptable degree of competency to perform surgery * * *". Further, in view of the circumstances of this case, "* * * whether Dr. Kauffman should have been permitted to do this surgery without supervision or assistance."

By statute, Montana has provided for licensing and supervision of the medical profession under the Medical Practice Act, sections 66-1010 through 66-1049, R.C.M. 1947, and responsibility for supervision is delegated to the Board of Medical Examiners.

Section 66-1011, R.C.M. 1947, provides:

"Purpose of Medical Practice Act. It is hereby declared, as a matter of legislative policy in the state of Montana, that the practice of medicine within the state of Montana is a privilege granted by the legislative authority and is not a natural right of individuals and that it is deemed necessary, as a matter of such policy and in the interests of the health, happiness, safety and welfare of the people of Montana, to provide laws and provisions covering the granting of that privilege and its subsequent use, control and regulation to the end that the public shall be properly protected against unprofessional, improper, unauthorized and unqualified practice of medicine and to license competent physicians to practice medicine and thereby provide for the health needs of the people of Montana."

Section 66-1013, R.C.M. 1947, creates the Montana State Board of Medical Examiners.

Section 66-1016, R.C.M. 1947, states the policy of supervision of physicians for the protection of the general public of the state of Montana:

"Policy. The board shall maintain reasonable and continuing supervision and surveillance over all licensees under this act to ensure that such licensees maintain standards of conduct and exercise the privileges granted hereunder in the greatest public interest and to carry out the purposes and provisions of this act."

Section 66-1022, R.C.M. 1947, provides for licensing the extent of practice permitted and specifically states how the practice of a physician may be limited:

"Statement as to practice permitted. The certificates issued shall state the extent and character of the practice that is permitted, and shall be in the form prescribed by the board. Neither the privileges nor the obligations granted to or imposed upon licensees may be altered except by legislative enactment or by action of the board duly authorized hereunder."

Respondent Hospital argues that the matter for all practical purposes is controlled by statute and the authority to police is exclusive with the state. Further, the so-called "Thompson Act", sections 94-3557 and 94-3558, R.C.M. 1947, provides a criminal penalty if respondent were to attempt to regulate or limit a medical doctor. Section 94-3557 provides:

"Discrimination by hospitals forbidden. Every person, persons, corporation or association conducting a hospital or hospitals not held for private or corporate profit or a hospital or hospitals that are institutions of purely public charity, that exempt themselves or are exempted from any state, county or municipal tax by reason thereof, shall not in any manner discriminate between the patients of any regularly licensed physician by reason of the fact that said physician is not a member of the medical staff of said hospital, or for any other reason, and such hospitals are hereby compelled to admit and care for the patients of any regularly licensed physician or physicians under the same terms and conditions as may be promulgated by the management of said hospital for the patients of any other regularly licensed physician." (Emphasis supplied)

At the onset, we decline to associate the intent of the "Thompson Act" with the problem here. Respondent and Amicus Curiae, Montana Hospital Association, rely on the words "for any other reason" to support their view, but overlook the language that follows to the end of the section. This language clearly demonstrates that one set of rules shall apply to all doctors to prevent discrimination, whatever the rule.

In support of his contentions, appellant relies almost entirely on a 1965 decision of the Illinois Supreme Court, Darling v. Charleston Comm. Memorial Hosp., 33 Ill.2d 326, 211 N.E.2d 253. Appellant argues this is the leading case that establishes the

the duty owed the patient by the hospital to regulate its staff members and that the hospital's bylaws, standards, and regulations define the duty or standard of care owed the patient.

A close examination of appellant's authority reveals some distinguishing differences from the factual situation in the instant case. In Darling an 18 year old boy with a broken leg was taken to the hospital emergency room and treated by a doctor on duty. This doctor was not employed by the plaintiff, but rather by the hospital and furnished by the hospital. In other words, the doctor in Darling was an employee of the hospital and the court's holding concerning the hospital's duty to supervise "staff" doctors is based on respondeat superior and staff doctors there should be distinguished from unpaid "staff" doctors in Montana.

This is not too clear from the language of the court in Darling, but in a later case in the same jurisdiction, Lundahl v. Rockford Memorial Hosp. Assn., 93 Ill.App.2d 461, 235 N.E.2d 671, 674, wherein the alleged negligence was failure of the hospital in its duty to act in requiring consultation and supervision, the same court cited Darling and said:

> "The plaintiffs cite the Darling case (ibid) in support of their contention that the hospital was negligent in its failure to require consultation between Dr. Paynter and the members of its staff. In the Darling case, however, the treating physician was an employee placed by the hospital on emergency duty and subject to its supervision. Dr. Paynter was not employed by the hospital, was not an agent of it and not subject to its supervision." (Emphasis supplied)

Darling also involved hospital care or a shocking lack of it by staff and nurses resulting in an 18 year old boy losing his leg. Quite obviously Darling has a different fact situation than the case before us.

Appellant also cites a Montana case, Maki v. Murray Hospital, 91 Mont. 251, 7 P.2d 228, where a delirious and violent patient left his bed and fell from a third floor window sustaining injuries.

- 10 -

In Maki, this Court very clearly stated the duty of Dr. Worden, the nurses, and the hospital to exercise reasonable skill and care in discovering the patient's condition and taking whatever action necessary to protect their patient. Yet, here again, we have a situation where the hospital employed Dr. Worden and the staff full-time, and liability is based on an employer-employee relationship as all principals involved were employees of the hospital.

The same problem is present in Foley v. Bishop Clarkson Memorial Hospital, 185 Neb. 89, 173 N.W.2d 881 (1970), where hospital employees were in violation of the hospital regulations and liability was found vicariously through its employees. Maki was cited in Foley as a minority rule, but cannot be said to apply beyond respondeat superior cases. It is of further interest to note that the Nebraska Supreme Court in Foley quarrels with the Darling decision with regard to the standard of care even in this class of cases. There the court noted that the duty owed is the exercise of that degree of care, skill and diligence used by hospitals generally in the community where the hospital is located, or in similar communities. This is the majority rule and while one may recognize the Darling rule as applying to exceptional situations, it is not conclusive of negligence, but simply evidence of negligence. There is no question that the Nebraska court on the basis of gross failure of "employees" to observe regulations which cost a patient's life, followed the minority rule and ordered a trial.

The cases cited by appellant from Washington, Florida and California are distinguishable on other grounds and we need not make further case by case examination. It is only necessary to note that in our review of all of the case authority we find a good demonstration of the analysis of the various text editors. In the Annotation, 69 ALR2d 305, 321, they point out a basic fact of definition which is not always made clear as we noted in

*Darling* and *Lundahl*, both authored by the same court. They advise:

> "* * * <u>the expression 'a hospital's staff' is somewhat
> ambiguous,</u> since it may conceivably refer to either (1)
> the group of salaried medical men---interns, residents,
> etc.---which the hospital employs on a full-time basis,
> or (2) those practicing physicians who have been granted
> the right to use the hospital's facilities for their own
> patients * * *." (Emphasis supplied)

In the same citation is an involved discussion on the
application of the doctrine of respondeat superior and its appli-
cation in finding a hospital negligent for a doctor's malpractice
occurring in the hospital. It concludes with this general state-
ment at p. 309:

> "Sometimes this determination rests primarily on
> the peculiar facts of individual cases, but there
> are certain general principles in this area that
> should be referred to. In the normal situation where
> a sick or injured person consults his own doctor for
> diagnosis and treatment, and the latter recommends
> hospital care, the hospital to which the patient is
> admitted is not liable for the doctor's misconduct
> resulting in injury to the patient, even though such
> misconduct takes place at the hospital, and even
> though certain other links between the hospital and
> the doctor, such as the circumstance that the latter
> is on the former's 'staff,' may exist.
>
> "On the other hand, when a person is taken directly
> to a hospital, as where he is rendered unconscious
> in an accident, and a physician hired by the hospital,
> such as an intern or resident, is guilty of malpractice
> in diagnosing or treating such person's condition, a
> different situation arises. Such a physician usually
> stands in a position with respect to the hospital
> which, under the normal tests of the existence of the
> master-servant relationship, would call for a ruling
> that he was the hospital's servant. In other words,
> such a doctor is normally paid a salary by the hospital,
> he spends all his working hours under the direction
> of the hospital's staff, he does not maintain a practice
> of his own, etc., and the result would normally be, and
> not infrequently is, that the physician must be regarded
> as a servant or agent of the hospital."

The same principle is stated another way in 41 C.J.S.
Hospitals, § 8, p. 346:

> "Liability of a private hospital for the negligent
> acts of the members of its professional staff must
> be predicated on the doctrine of respondeat superior.
> Accordingly, a private hospital is not responsible
> for any default on the part of a physician or surgeon
> who practices his profession as an independent agent,
> and, where a patient employs a physician or surgeon
> not in the employ of the hospital, the hospital is not
> liable for his negligence." See also 40 Am Jur 2d,
> Hospitals & Asylums, § 28.

The authorities offered all concern the duty to supervise or require consultation on a specific case that constituted malpractice by a doctor or hospital personnel with liability being established under the doctrine of respondeat superior. No authority has been cited that extends this duty to the case of an independent contractor. Further, there is no authority cited that even discusses the real point in issue here ----Is the Hospital negligent under the ordinary rules of negligence for not limiting or expelling the doctor before the fact of the case of malpractice, and excluding any reference to the malpractice itself except in damages? All the citations might reasonably be construed to establish a standard of care, and are certainly not in point with this case on negligence or duty. However, can the standards discussed heretofore in the case of a doctor employed by the hospital in a specific malpractice case be imposed on a hospital in the long term of before the fact regulation of independent staff doctors?

At the risk of belabored definition, the integration of a modern hospital becomes readily apparent as the various boards, reviewing committees, and designation of privileges are found to rest on a structure designed to control, supervise, and review the work within the hospital. The standards of hospital accreditation, the state licensing regulations, and the respondent's bylaws demonstrate that the medical profession and other responsible authorities regard it as both desirable and feasible that a hospital assume certain responsibilities for the care of the patient.

Therefore, being presented with a direct negligence issue which preexists the damage complained of here, and if we were to recognize the standard of care suggested by appellant which departs from the majority rule and considers a violation of the hospital bylaws as evidence of negligence, then we could not circumvent the bylaw procedures and find negligence on a vicarious

basis as suggested in issue No. 2, nor could we find negligence based on the majority rule of "community standard".

Assuming that the Board of Directors of the hospital entity has a duty to "act" when put on notice or advised by the medical section that a doctor is incompetent to continue to practice medicine, the law recognizes that this determination must be made by medical personnel skilled in medical sciences and competent to make this determination. In this case that was not done by the medical section or communicated to the proper Hospital authority. Kauffman's prior limitation and reinstatement in 1967, cannot be considered as negligence on this record, which fails to reveal facts at that hearing that would constitute improper procedures by the Board of Directors or that it acted contrary to medical advice.

Extensive testimony was given at trial by Dr. Buchanan and Dr. Sanford who were, or had been at the time of the origin of this action, members of the medical staff of Hospital. In that testimony a record of violations of Hospital rules, regulations, and procedures was recited regarding Dr. Kauffman's record keeping which at various times was the subject of numerous discussions in medical staff meetings. Dr. Kauffman had been given several admonitions concerning the deficiencies in his record keeping / and after adamant promises by Dr. Kauffman to keep up his records and observe the rules of Hospital, he was given the privilege of continuing, and held full privileges at the times pertinent here.

The record insofar as the Hospital is concerned, demonstrates an effort to supervise the quality of medical practice within the Hospital. Additionally, Hospital's records did indicate that Dr. Bennett was on the case with Dr. Kauffman and even though not present at the second surgical procedure did participate during the post-operative care.

The question of whether or not a hospital can limit a medical license under the statute is not particularly relevant. This power has been reserved by statute to the Board of Medical Examiners and is remedial only. If a duty to "act" were found and a doctor would not voluntarily comply, a formal complaint to the Board of Medical Examiners would satisfy that duty.

Concurrent with the testimony of Drs. Buchanan and Sanford, objections were sustained regarding their professional opinions of Dr. Kauffman's competence to practice, along with several denials of offers of proof made by appellant, similar in nature. The court sustained the objections and denied the offers on the basis of relevancy. Although the testimony was relevant to liabilities of Dr. Kauffman, it was not deemed relevant to the liabilities of Hospital. We agree for the same reasons. Knowledge within these doctors' minds, uncommunicated to the Board, is not a demonstration of knowledge of the Board as a matter of law, only a matter of conscience of the individual doctors.

While not necessary to sustain this Opinion, the matter of proximate cause was argued. We will note that in a direct negligence suit of this type not based on respondeat superior, the additional burden of the negligence being the proximate cause of the injury is presented and judged by the standards approved by this Court, the evidence produced in this record fails in that regard. Sztaba v. Great Northern Railway, 147 Mont. 185, 411 P.2d 379.

The judgment of the trial court is affirmed.

_____
Associate Justice

- 15 -

We Concur:

_____
Chief Justice

_____

_____
Associate Justices

_____
Hon. Jack Shanstrom, District Judge,
sitting for Justice Wesley Castles.

- 16 -