589 P.2d 201

Charles Earnest COOPER, and Ruby
Thelma Cooper,
Plaintiffs-Appellants,

v.

R. L. CURRY, M.D., and Memorial Hospi-
tal, Inc., Defendants-Appellees.

No. 3176.

Court of Appeals of New Mexico.

Oct. 3, 1978.

Writ of Certiorari Quashed Jan. 2, 1979.

William J. Darling, Kool, Kool, Bloomfield & Eaves, P. A., Albuquerque, for plaintiffs-appellants.

Dan B. Buzzard, Harry L. Patton, Clovis, Sarah M. Singleton, Pickard & Singleton, Santa Fe, for defendants-appellees.

## OPINION

LOPEZ, Judge.

The plaintiffs-appellants (Mr. and Mrs. Charles Cooper), filed suit against Dr. Curry and the defendant-appellee, Memorial Hospital, Inc., (the hospital) to recover damages for injuries connected with eye surgery performed upon Mrs. Cooper by Dr. Curry at the hospital. Both plaintiffs sought damages for the resulting total blindness to Mrs. Cooper. The jury returned a verdict for the plaintiffs in the amount of $600,000.00 against Dr. Curry, but found the hospital not liable. The appellants now appeal the judgment in favor of the hospital. Dr. Curry is not a party to this appeal. We affirm.

The plaintiffs present several points for reversal: (1) the hospital had a duty to obtain an informed consent from Mrs. Cooper; (2) the trial court erred in excluding certain evidence; (3) the trial court committed prejudicial error by refusing to give an instruction on joint venture; and (4) the trial court committed prejudicial error in giving its Instruction No. 34, which disclaimed the hospital's vicarious liability.

### Facts

Mrs. Cooper was admitted to the hospital for a bilateral cataract extraction. When Mrs. Cooper entered the hospital, the admitting clerk had Mrs. Cooper sign a standard consent for surgery form. Mrs. Cooper had discussed the operation with Dr. Curry before going to the hospital. She had approved the operation on both eyes, and had requested that both cataracts be removed during one hospital stay. The first operation was on her right eye and the second operation was on her left eye. Mrs. Cooper did not sign a second consent form before the second operation. Subsequent to the second operation, she became blind.

At trial, the plaintiffs contended that Dr. Curry failed to disclose all the pertinent facts relevant to Mrs. Cooper's condition; failed to warn the plaintiffs of the inherent risks involved; and did not get an informed consent from Mrs. Cooper. The plaintiffs also contended that the hospital failed to get an informed consent, or failed to determine whether an informed consent had been obtained.

The court gave its instructions, among which was Instruction No. 34, which generally instructed the jury that the hospital could not be found liable on the basis of Dr. Curry's malpractice.

Point'I

*The hospital had no duty to obtain an informed consent from Mrs. Cooper.*

█ The informed consent issue arises when a patient is informed that he or she is to be touched in a specific way and is in fact touched in that way but a harmful result arises from a risk about which the patient was not informed. Plant, *An Analysis of an Informed Consent,* 36 Fordham L.Rev. 639, 656 (1968).

Mrs. Cooper testified that she knew she was to have a bilateral cataract operation; she consented to the operation; and such an operation was performed. However, Mrs. Cooper testified that she was not fully informed of the risks involved in the bilateral cataract operation. The question we must decide is whether the hospital had a duty either to inform Mrs. Cooper of the risks involved in the bilateral cataract operation or to determine whether an informed consent had been obtained.

We first discuss the history of the doctrine of informed consent and the history of a hospital's liability for malpractice committed on a patient while in a hospital. *Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 105 N.E. 92 (N.Y.App. 1914), was one of the earliest cases to deal with the subject. That case establishes a medical patient's right to control his or her own body in relation to treatment, and gives such patient a cause of action for assault and battery when medical treatment is administered without consent.

█ *Salgo v. Leland Stanford Jr. University Bd. of Trust.,* 154 Cal.App.2d 560, 317 P.2d 170 (1957), a major case in the development of modern informed consent law, requires that a physician not only obtain consent to treatment, but also inform the patient of sufficient facts to enable the patient to intelligently consent to treatment. A failure to do so results in a cause of action for negligence. In New Mexico, a physician's failure to obtain an informed consent constitutes negligence. *Woods v. Brumlop,* 71 N.M. 221, 377 P.2d 520 (1962); accord, *Demers v. Gerety,* 85 N.M. 641, 515 P.2d 645 (Ct.App.1973), *rev'd on other grounds,* 86 N.M. 141, 520 P.2d 869, *on remand,* 87 N.M. 52, 529 P.2d 278 (Ct.App. 1974).

*Schloendorff,* supra, also addressed the issue of a hospital's liability vis-a-vis the acts of physicians in the performance of an operation without a patient's consent. *Schloendorff,* supra, posited one rationale for relieving the hospital of liability. The court said that the relationship between a hospital and a physician was not a master-servant relationship, but was instead one in which the physician operated as an independent contractor. The doctrine of *respondeat superior* was therefore inapplicable.

█ After *Schloendorff,* supra, courts expanded the liability of hospitals for the torts of employees, including physician-employees, under the doctrine of *respondeat superior. Bing v. Thunig,* 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957); *Westbrook v. Lea General Hospital,* 85 N.M. 191, 510 P.2d 515 (Ct.App.1973), *cert. denied,* 85 N.M. 228, 511 P.2d 554 (1973). However, courts remain reluctant to hold hospitals liable for torts committed by non-employee physicians. Courts consider it irrelevant that a physician has "staff privileges" at a hospital, since such privileges merely permit the physician to use the hospital for his or her private patients. As stated in Southwick, *The Hospital as an Institution—Expanding Responsibilities Change Its Relationship with the Staff Physician,* 9 Cal.W. L.Rev. 429, 440 (1973):

[A] staff doctor having no more relationship to the hospital than a staff appointment is solely responsible for his personal malpractice or negligence: The hospital is not vicariously liable for the tort of a physician who is not an "employee".

See *Smith v. Klebenoff,* 84 N.M. 50, 499 P.2d 368 (Ct.App.1972), *cert. denied,* 84 N.M. 37, 499 P.2d 355 (1972); 41 C.J.S. Hospitals, § 8 (1944).

The majority view is that when a physician receives no salary from a hospital, he or she is an independent contractor, and, as such, the hospital is not liable for the doctor's malpractice. *Hundt v. Proctor Com-*

munity *Hospital,* 5 Ill.App.3d 987, 284 N.E.2d 676 (1972); *Mayers v. Litow,* 154 Cal.App.2d 413, 316 P.2d 351 (1947); *Lundahl v. Rockford Memorial Hospital Association,* 93 Ill.App.2d 461, 235 N.E.2d 671 (1968); *Fiorentino v. Wenger,* 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296 (1967).

Plaintiffs concede that Dr. Curry was not an employee of the hospital. They attempt, however, to lay legal responsibility on the hospital under a corporate negligence theory. In a few instances, courts have imposed liability on hospitals under a corporate negligence theory, but this liability has been limited to the negligent granting of staff privileges or the negligent supervision of treatment. *Mitchell County Hospital Authority v. Joiner,* 229 Ga. 140, 189 S.E.2d 412 (1971); *Darling v. Community Memorial Hospital,* 33 Ill.2d 326, 211 N.E.2d 253 (1965). In no case has a hospital been held liable for failing to obtain an informed consent.

The court in *Fiorentino,* supra, even stated that the only possible reason for requiring a hospital to obtain consent might be the nature of the operation. The court then negated this, saying:

So long as it cannot be said that a spinal-jack operation is per se an act of malpractice, *the hospital does not share and should not share in the responsibility to advise patients* of the novelty and risks attendant on the procedure. [Emphasis added] *Fiorentino,* supra, 280 N.Y.S.2d at 380, 227 N.E.2d at 301.

■ Plaintiffs' position, that hospital liability arises from the admission clerk's failure to fill out the consent form fully and the hospital's failure to obtain a second consent form, runs counter to the purposes of obtaining an informed consent. We agree with *Stivers v. George Washington University,* 116 U.S.App.D.C. 29, 320 F.2d 751 (1963) where the court said:

While the consent to the operation was obtained in writing by a lay employee it seems clear he was performing only a ministerial or administrative function to implement the consultation between ap-

pellant [the patient] and Dr. Barrett [the doctor]; *a lay person would not be competent to describe the procedure or discuss the possible consequences.* [Emphasis added]

Based upon *Stivers,* the admission clerk was merely performing an administerial function for Dr. Curry who had sent Mrs. Cooper to the hospital. The admission clerk could not be expected to inform Mrs. Cooper fully about all the risks of the operation she was about to undergo, and the hospital cannot be held liable for the clerk's failure to obtain an informed consent. For the admission clerk to have asked Mrs. Cooper questions regarding the operation would have interfered with the doctor-patient fiduciary relationship. *Demers v. Gerety,* supra; *Fiorentino v. Wenger,* supra.

Hospital liability should not be extended in the area of informed consent. Such an extension would serve to interfere in the delicate doctor-patient relationship. It would discourage hospitals from allowing physicians to use their facilities for novel or experimental medical procedures and could induce hospitals to discourage patients from undergoing such operations. *Fiorentino v. Wenger,* supra.

The facts support the trial court's ruling that the hospital was not liable for the negligence of the doctor because he was an independent contractor. We conclude that the hospital did not have a duty to obtain an informed consent from Mrs. Cooper.

Point II

*Exclusion of Dr. Schultz' testimony.*

■ Under this point the plaintiffs argue that the court erred in excluding Dr. Schultz' testimony regarding Dr. Curry's malpractice because it was relevant to the question of whether the hospital exercised due care in the reappointment of its staff physicians.

We fail to see anywhere in the record where Dr. Schultz' testimony would have borne any relationship to the hospital's duty of care in staff reappointments. Part of Dr. Schultz' testimony went to alleged acts

that occurred from four to ten years prior to his testimony. The trial court properly considered the remoteness and vagueness of the testimony in determining the probative value of the testimony. *In re Williams' Will,* 71 N.M. 39, 376 P.2d 3 (1962).

Another portion of Dr. Schultz' testimony went to Dr. Curry's excessive visits to welfare patients. While this might show that Dr. Curry was taking advantage of the Welfare Department, it hardly demonstrates an incompetence relevant to the hospital's duty to exercise care in staff reappointments.

Further, at no time during this time, did Dr. Schultz convey this information regarding Dr. Curry's incompetence to the hospital. In *Hull v. North Valley Hospital,* 159 Mont. 375, 498 P.2d 136 (Mont.1972), the same question of hospital liability for appointment of an incompetent physician was at issue. The plaintiff in *Hull,* supra, introduced opinion testimony of other doctors on the staff. The court there said:

"Knowledge within these doctors' minds, uncommunicated to the Board, is not a demonstration of knowledge of the Board as a matter of law, only a matter of conscience of the individual doctors."

The tendered testimony was inadmissible with regard to Dr. Curry. It was completely irrelevant with regard to the hospital's liability.

### Point III

*The hospital and Dr. Curry were not engaged in a joint venture.*

■■ Appellants argue that a joint venture existed because the doctor and the hospital had a community of interest in treating the plaintiff. This has been held to be insufficient to create a joint venture. *Underwood v. Holy Name of Jesus Hospital,* 289 Ala. 216, 266 So.2d 773 (1972). In *Underwood,* supra, at 776 the court said:

"As a general rule, in order to constitute a joint adventure there must be a community of interest in the performance of a common purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and a duty to share in any losses which may be sustained." [Emphasis added]

Accord, *Fullerton v. Kaune,* 72 N.M. 201, 382 P.2d 529 (1963). The elements of a joint venture are absent in the relationship between Dr. Curry and the hospital. The record does not show that Dr. Curry had a proprietary interest in the hospital's property, that there existed a mutual right to control, or that Dr. Curry was to share in the hospital's profits or losses. As such, there was not even a colorable showing of joint venture.

Under the facts and the law the hospital was not engaged in a joint venture with Dr. Curry. A party to a suit is entitled to an instruction of his theory of the case if there is evidence to support such an instruction. *Tapia v. Panhandle Steel Erectors Company,* 78 N.M. 86, 428 P.2d 625 (1967). There was no evidence to support a theory of joint venture in the case at bar and the trial court properly refused such an instruction.

### Point IV

*The trial court did not commit prejudicial error in giving Instruction No. 34.*

■ Under this point plaintiffs contend that the court erred in giving its Instruction No. 34 which basically instructed the jury that the hospital could not be found liable on the basis of Dr. Curry's malpractice.

This issue is not before this Court because the plaintiffs failed to challenge the court's Instruction No. 34 in the proceedings below. *Gonzales v. Allison & Harvey, Inc.,* 71 N.M. 478, 379 P.2d 772 (1963).

The trial court committed no error. The judgment of the trial court is affirmed.

IT IS SO ORDERED.

HERNANDEZ, J., concurs.

SUTIN, J. (dissenting).

SUTIN, Judge (dissenting).

I dissent.

On May 24, 1973, Mrs. Cooper entered the Memorial Hospital for a bilateral cataract examination. The admitting clerk had Mrs. Cooper sign a consent for surgery form. The pertinent part reads as follows:

I HEREBY GRANT PERMISSION TO AND AUTHORIZE THE DOCTORS OF MEMORIAL HOSPITAL TO GIVE SUCH ANESTHETICS AND TO PERFORM SUCH OPERATIONS AS IN THEIR OPINION ARE FOUND NECESSARY UPON _____ WITH A DISTINCT UNDERSTANDING THAT THERE IS SOME DANGER IN THE OPERATION, THAT COMPLICATIONS MIGHT ARISE AND, I LEAVE THE WHOLE MATTER OF OPERATIVE PROCEDURE AND TREATMENT TO THE BEST JUDGMENT OF SAID DOCTOR.

The signing of this consent form was in accord with the Nursing Procedures Manual prepared by the hospital medical staff. Instruction No. 2(b) in the section on Pre-operative care states: "Have operative permit signed. (Necessary for all house patients.)"

On May 25, 1973, Dr. Curry performed the surgical procedure on her right eye. Four days later, on May 29, 1973, Dr. Curry performed a surgical procedure on her left eye. The nurses' pre-operative checklist stated "Permit signed" but no consent to this surgical procedure was obtained by the hospital.

Dr. Cleon L. Schultz, an ophthalmologist, testified that, as the patients enter the hospital for surgery, the standard for hospitals across the nation is to obtain a consent from a patient before any surgical procedure is performed. The consent which Mrs. Cooper gave was a deviation from the accepted standard because there was no definition of what the operation was to be. The failure to obtain the second surgical consent was also not in keeping with accepted practice. To obtain two surgical consents for two separate surgical procedures is a common practice. A second consent is essential because if something unfortunate happens during the first surgery, the patient has an opportunity to reconsider the second surgery.

The hospital adopted the above practices as rules on June 27, 1973, a month following the second surgery. Two of the provisions read as follows:

2. Written, signed, informed, surgical consent shall be obtained prior to the operative procedure except in those situations where the patient's life is in jeopardy and suitable signatures cannot be obtained due to the conditions of the patient. . . .

3. Should a second operation be required during the patient's stay in the hospital, a second consent specifically worded should be obtained. . . .

The trial court refused to instruct the jury on one of plaintiff's theories of recovery. It reads:

Defendant Hospital had a duty to exercise reasonable care in ascertaining whether Plaintiff Ruby Thelma Cooper had consented to the surgical procedure in treatment of her at Defendant Hospital and that Defendant Hospital breached the duty of care proximately causing Plaintiff Ruby Thelma Cooper to become blind in both eyes.

The trial court also refused to instruct the jury that:

A hospital has a duty to its patients to exercise reasonable care in ascertaining whether the patient has consented to a surgical procedure or other medical treatment which takes place at the hospital.

The failure to so instruct the jury was reversible error.

To the best of my knowledge, the duty of a hospital to ascertain whether a patient has consented to surgical procedure is a matter of first impression, not only in New Mexico, but in the United States. This hospital consent relationship should be carefully scrutinized to determine its effect on the liability of a hospital.

Memorial Hospital and the district court misconstrued the position Cooper took in the court below and now on appeal. Cooper contended that the hospital had a duty to exercise reasonable care to ascertain wheth-

er she consented to a surgical procedure. Memorial Hospital argues that:

> The hospital was under no duty to obtain the informed consent from Mrs. Cooper.

The trial court refused to instruct the jury on Cooper's theory of liability, and *ruled that the hospital had no legal duty to obtain an informed consent from Mrs. Cooper.*

The hospital and the trial court view the crucial issue as being whether it was the hospital's duty to *obtain* an informed consent from Mrs. Cooper; Mrs. Cooper construes the issue as being whether the hospital had a duty to *ascertain* whether informed consent had been obtained. Mrs. Cooper's contention is correct.

The duty of obtaining informed consent rests with the surgeon. In cases where medical treatment involves a grave risk of collateral injury, the physician is under a duty to advise the patient of such risks before initiating treatment. The patient, faced with a choice of undergoing the proposed treatment, must be given sufficient information to intelligently exercise his or her own judgment by balancing the probable risks against the probable benefits. *Ze-Barth v. Swedish Hospital Medical Center,* 81 Wash.2d 12, 499 P.2d 1, 52 A.L.R.3d 1067 (1972). I call it an "educated consent." *Demers v. Gerety,* 85 N.M. 641, 645, 515 P.2d 645 (Ct.App.1973), id., 86 N.M. 141, 520 P.2d 869 (1974), id., 87 N.M. 52, 529 P.2d 278 (Ct.App.1974), id., 92 N.M. 396, 589 P.2d 180, cert. granted March 16, 1978. The failure to obtain an educated consent can render the physician liable for medical malpractice.

The jury found Dr. Curry liable for medical malpractice. By its verdict it found that Dr. Curry did not obtain an educated consent from Mrs. Cooper. The question then becomes whether an educated consent is of such importance that a hospital should exercise *reasonable care* to ascertain whether one has been obtained by the surgeon? The answer is "Yes."

A. *The hospital had a duty to ascertain patient consent.*

A hospital has a profound interest in maintaining high standards of medical care in protecting the health and lives of its patients. It has a duty to review the quality of patient care and provide safeguards to insure that its staff, agents and servants perform their duties with reasonable care.

The standard by which a hospital is judged is whether it exercised that degree of care and skill which is expected of a reasonably competent hospital in the same or similar community. *Goffe v. Pharmaseal Laboratories, Inc.,* 90 N.M. 764, 773, 568 P.2d 600 (Ct.App.1976), Sutin, J., Dissenting; reversed, 90 N.M. 753, 568 P.2d 589 (1977).

A fiduciary relationship exists between hospital-patient and physician-patient. *Wohlgemuth v. Meyer,* 139 Cal.2d 326, 293 P.2d 816 (1956); *Gopaul v. Herrick Memorial Hospital,* 38 Cal.App.3d 1002, 113 Cal. Rptr. 811 (1974); *Demers v. Gerety,* 85 N.M. at 645, 515 P.2d 645 supra. From these fiduciary relationships stem two duties: The duty of the physician to obtain the educated consent of a patient prior to surgery and the duty of a hospital to ascertain whether the doctor has obtained consent. These are twin duties essential for the protection of life and health.

The Memorial Hospital nurses knew that the hospital had a duty to ascertain whether consent had been obtained. They did obtain one consent that did not meet the standards required; they did not obtain consent for the second operation.

Defendant has misread *Fiorentino v. Wenger,* 19 N.Y.2d 407, 280 N.Y.S.2d 373, 227 N.E.2d 296 (1967). The principal issue was whether a hospital had an obligation to a patient using the facilities *to make certain* that the patient had given an informed consent to the patient's privately retained surgeon. In holding that certainty was not required, the court established a rule that confirms the contention of Cooper. The court said:

> Assuming whatever degree of reprehensibility in the surgeon's conduct and

however drastic or radical the operation, liability does not attach to the hospital *unless it knew or should have known that there was lacking an informed consent* or that the operation was not permissible under existing standards. [Emphasis added.] [280 N.Y.S.2d at 381, 227 N.E.2d at 301.]

The hospital in *Fiorentino* was held immune to liability "just because it did not intervene into the patient-physician relationship." (*Id*). *Fiorentino* holds that the doctor is primarily responsible for obtaining consent from the patient and the hospital should ascertain whether consent was procured. Memorial Hospital was not strictly liable for making certain that consent had been obtained prior to surgery, but it did have a duty to exercise reasonable care to ascertain whether such consent had been procured.

The regulations, standards and bylaws of the hospital are evidence that aids "the jury in deciding what was feasible *and what the defendant knew or should have known.*" [Emphasis added.] *Darling v. Charleston Comm. Mem. Hospital,* 33 Ill.2d 326, 211 N.E.2d 253, 14 A.L.R.3d 860, 867 (1965). The Nursing Procedures Manual directed the nurses at Memorial Hospital to ascertain whether Mrs. Cooper had consented to surgery. The hospital standard, later promulgated into a rule, demanded that consent be obtained not only for the first, but for the second operative procedure. This was sufficient to apprise the jury whether the hospital "knew or should have known" whether consent had been given by Mrs. Cooper.

B. *The distinction between respondeat superior and independent contractor is no longer a viable method for determining a hospital's liability for a doctor's actions.*

In describing the relations that exist between a hospital and a surgeon who operates on a patient in that hospital, two ostensible principles of law have emerged: (1) Under the doctrine of *respondeat superior,* a hospital is liable for the malpractice of a surgeon who is an agent or servant of the hospital. (2) A hospital is not liable for the malpractice of a surgeon, an *independent contractor,* who exercises an independent employment and contracts to perform his services according to his own method without being subject to the control of the hospital, except as to the results of his work. Annot., Liability of hospital or sanitarium for negligence of physician or surgeon, 69 A.L.R.2d 305 (1960).

Defendant relies on *Stivers v. George Washington University,* 116 U.S.App.D.C. 29, 320 F.2d 751 (1963). Here, the jury exonerated the doctor, *the hospital's agent,* but returned a verdict for the plaintiff against the hospital. The district court thereafter granted the hospital's motion for judgment in its favor notwithstanding the verdict. The Court of Appeals affirmed because the two verdicts were inconsistent and incompatible. The hospital, absent any independent duty, could not be liable if its agent was not. In passing, the court said:

. . . While the consent to the operation was obtained in writing by a lay employee it seems clear *he was performing only a ministerial or administrative function to implement the consultation between appellant and Dr. Barrett; a lay person would not be competent to describe the procedure or discuss the possible consequences.* The patient was entitled to rely on Dr. Barrett and the evidence is such that a jury could reasonably find she did so. [Emphasis added.] [116 U.S.App.D.C. at 31, 320 F.2d at 753.]

The distinction between ministerial and medical function is archaic and it renders *Stivers* outmoded.

In 1914, Justice Cardozo established the doctrine of the difference between an "administrative" function of a nurse and a "medical" inquiry-producing act to determine the existence of the doctrine of *respondeat superior. Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 105 N.E. 92 (1914). Time passed, conditions in hospitals changed, and 43 years later *Schloendorff* was overruled in *Bing v. Thunig,* 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143

N.E.2d 3 (1957), on the issue of the liability of a hospital for the negligence of its nurses. Justice Fuld said:

. . . Certainly, the person who avails himself of "hospital facilities" *expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility.* [Emphasis added.]

\* \* \* \* \* \*

The doctrine of *respondeat superior* is grounded on firm principles of law and justice. Liability is the rule, immunity the exception. It is not too much to expect that those who serve and minister to members of the public should do so, as do all others, subject to that principle and within the obligation not to injure through carelessness. [163 N.Y.S.2d at 10, 143 N.E.2d at 8.]

The rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing. It should be discarded. To the suggestion that *stare decisis* compels us to perpetuate it until the legislature acts, a ready answer is at hand. It was intended, not to effect a "petrifying rigidity," but to assure the justice that flows from certainty and stability. *If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive, and no principle constrains us to follow it.* . . . [Emphasis added.] [163 N.Y.S.2d at 11, 143 N.E.2d at 9.]

Professor Llewellyn, in his book, *The Common Law Tradition Deciding Appeals* (1960), page 118, wrote:

The fact is that every opinion is in one aspect an argument, an argument prepared by a lawyer. . . . And in all of this the opinion-writing judge is not only a lawyer but an advocate.

This description of an appellate judge is correct. I advocate that a hospital should be liable for the malpractice of a surgeon whether he is an agent or an independent contractor. The distinction between independent contractor and agent does not realistically reflect the symbiotic relationship between a hospital and its medical staff. To me, this distinction is a distinction without a difference.

The hospital and the medical staff bear a fiduciary relationship with a patient in the hospital; the public, and the hospital itself, view the hospital and its staff as one entity; there is a community of interest in the promotion of good health for patients. The bylaws of the Memorial Hospital provide that a member of the medical staff serves as a director of the hospital. The medical committee of the hospital, composed of staff members and hospital administrators, recommends the type of professional work permitted to be done by each member of the medical staff and all rules and regulations that govern the medical staff to assure the proper care of the patients. In addition, the committee communicates to the directors the requests or recommendations of the medical staff and receives and considers all reports on the work of the medical staff to formulate recommendations to aid the hospital and patients. The bylaws provide *that each member of this medical staff created by the board shall have appropriate authority and responsibility for the care of patients.* The bylaws evidence how the hospital and the medical staff, together, monitor and review the performance of staff doctors and restrict or suspend their privileges.

The reality of Memorial Hospital's governing structure and distribution of power permits no basis for distributing liability between a doctor and the hospital based on an agent-independent contractor distinction. Therefore, we should be guided by the realities of the situation and find a hospital liable for the negligence of a doctor who has been permitted by the hospital to use its facilities. .

C. *Even if the distinction between independent contractor and agent is retained, a physician is an agent of the hospital and not an independent contractor.*

The potential for control, evidenced by the disciplinary structure of the hospital's

bylaws, is the determinative factor in deciding whether Dr. Curry was an independent contractor or an agent of the hospital. *Shaver v. Bell,* 74 N.M. 700, 397 P.2d 723 (1964). It is of no significance that any control was not exercised by the employer. *Scott v. Murphy Corp.,* 79 N.M. 697, 448 P.2d 803 (1968).

The hospital creates a medical staff, supervises and reviews the work of the physician to determine whether the physician is competent to remain on the medical staff. The medical staff's authority is limited by the hospital's bylaws, as well as the bylaws, rules and regulations of the medical staff. In cases of dispute, the board's decision is final. The medical staff's bylaws provide that the hospital board can terminate any staff member at any time, after consultation with the active staff, for a violation of bylaws, rules and regulations. In fact, if the medical staff is negligent in failing to take any action against an unskilled surgeon, the hospital is also negligent. *Purcell v. Zimbelman,* 18 Ariz.App. 75, 500 P.2d 335 (1972).

It is undisputed that the hospital controlled the right of Dr. Curry to practice medicine in the hospital. On prior occasions, Dr. Curry was suspended until his medical records were current. On March 28, 1973, two months prior to this surgical operation, the administrator notified Dr. Curry that his admitting privileges were suspended and that he would be notified when he would again be able to admit patients. The record does not show when or under what circumstances Dr. Curry was allowed to once again admit patients.

It is also undisputed that the hospital exercised control over Dr. Curry as to the details of keeping medical records for the hospital. Did the hospital have the right to control the manner and method of performance of his services? There is no question in my mind that this right of control existed through the interrelationship of the hospital and the medical staff. I am not prepared to accept the conclusion that the members of the medical staff are independent contractors when, as a whole, the staff has a representative on the hospital board, has rules and regulations which are supervised by the medical committee and whose services in the hospital are governed by the medical board. One cannot exist without the other. Both cooperate like master and servant so that hospitalization will protect the life and health of every patient.

This conclusion is not unique. A doctor employed at a salary to run a sanitarium is an agent or employee of the hospital and the hospital is liable for the doctor's malpractice. *Brown v. Moore,* 247 F.2d 711, 69 A.L.R.2d 288 (3d Cir. 1957). A medical center is also liable to a patient for malpractice of a non-center doctor called in by a center doctor on a theory of agency or agency by estoppel. *Howard v. Park,* 37 Mich.App. 496, 195 N.W.2d 39 (1972). Yet, we have held without reason or authority that a medical center doctor *who assisted a non-center doctor* in surgery did not establish liability of the medical center *because the center-doctor acted independently of his relationship with the clinic. Smith v. Klebanoff,* 84 N.M. 50, 499 P.2d 368 (Ct.App. 1972).

On the other hand, an issue of fact, concerning the doctor's status as an agent of the hospital, existed where a patient entered a hospital in an emergency and was assigned to an active medical staff doctor on service in rotation. *Vanaman v. Milford Memorial Hospital, Inc.,* 272 A.2d 718 (Del. Supr.1970). Yet a hospital was held not liable for negligence of a doctor in the operation of an emergency room *even though the doctor was employed by the hospital under a written agreement, Pogue v. Hospital Authority of De Kalb County,* 120 Ga.App. 230, 170 S.E.2d 53 (1969), and even though it has been held that such a contract is not controlling. A patient can assume that the doctor and staff were acting on behalf of the hospital and the patient is not bound by the secret limitations in the private contract. A hospital is liable whether the doctor is an independent contractor or not. *Mduba v. Benedictine Hospital,* 52 A.D.2d 450, 384 N.Y.S.2d 527 (1976).

New Mexico should not hobble or wobble from one theory to another; if New Mexico continues to cling to the agent-independent contractor distinction, it should commit itself to the view of a doctor as an agent of a hospital.

### D. Even assuming that Dr. Curry was an independent contractor, the hospital is still liable for his negligence.

If a holding establishing the hospital's liability on an agency theory is too radical to stomach, nonetheless, the hospital is still liable if it is assumed that the doctor is an independent contractor.

A well recognized exception to the general rule of nonliability exists in a situation wherein the work to be performed is inherently dangerous. The contractee cannot escape the responsibility for damage resulting from such tasks. *Southern California Petroleum Corp. v. Royal Indem. Co.,* 70 N.M. 24, 369 P.2d 407 (1962); *Pendergrass v. Lovelace,* 57 N.M. 661, 262 P.2d 231 (1953).

When a hospital admits a patient for surgical procedures it knows that the procedures are inherently dangerous to the life and health of the patient. This dangerous condition exists in the hospital until surgery is performed. At this point in time, a hospital owes a duty to a patient to admit only competent physicians to staff privileges so that a competent surgeon will remedy this dangerous condition. The hospital cannot escape liability by delegating this duty to an incompetent surgeon. *Corleto v. Shore Memorial Hospital,* 138 N.J.Super. 302, 350 A.2d 534 (1975). The social implications of such a holding will not disrupt the medical world; the court in *Corleto* noted that to permit the malpractice lawsuit to proceed would not have a wide-spread impact on New Jersey hospitals and doctors. The court felt that the suit would not affect the composition of medical staffs and medical boards because it is more important that competent physicians practice within their hospitals to raise the level of medical care within the state.

### E. Failure to submit theory to jury was prejudicial error.

The major issue is whether the failure to submit to the jury Cooper's theory of hospital liability is reversible error.

Cooper pled that the hospital allowed surgical procedures to take place without obtaining the consent from Cooper prior to each operation. There was evidence to support this claim. The hospital, to protect the health of Mrs. Cooper, had a duty to ascertain whether Dr. Curry had obtained the consent of Mrs. Cooper to each operation. It is established law that the failure to instruct specifically on a litigant's theory of the case is prejudicial error. *Stewart v. Oberholtzer,* 57 N.M. 253, 258 P.2d 369 (1953); *Le Doux v. Martinez,* 57 N.M. 86, 254 P.2d 685 (1953); *Clay v. Texas-Arizona Motor Freight,* 49 N.M. 157, 159 P.2d 317 (1945).

Upon this basis, Mrs. Cooper is entitled to a new trial.

### F. Other reversible error noted.

(1) The nature of the relationship between Dr. Curry and the hospital was a matter of law to be determined by the trial court from the facts. *Roybal v. Bates Lumber Company,* 76 N.M. 127, 412 P.2d 555 (1966). The trial court made no such determination.

(2) The hospital rules, with reference to consent, adopted a month following the second surgery were admitted in evidence.

The jury read the hospital rules and the instructions, and found that Mrs. Cooper made no claim with reference to consent. The jury was not instructed to disregard the hospital rules. Neither did the hospital request such an instruction. It logically follows the jury concluded that the hospital was immune to liability.

Reversible error occurs where the substantial rights of a party have been affected. The record is read in the light of those standards adopted for a fair trial. We do not search for evidence of obvious prejudice. The slightest evidence thereof is sufficient. In fact, we will resolve all doubt in

428

favor of the party claiming prejudice. *Anderson v. Welsh*, 86 N.M. 767, 527 P.2d 1079 (Ct.App.1974).

An appellate court reviews a record to determine whether the litigants had a fair trial. If it believes a matter is confusing to itself, it says it was confusing to the jury. If it believes a jury was misled, it says the jury was misled. If it believes the slightest evidence of prejudice exists, it says the litigant was prejudiced. An appellate court judges the conduct of the jury in accordance with the personal knowledge and experience of each member of the court as he truly understands the facts of life in the courtroom. It will reverse or affirm in accordance with its personal feelings, or on its own interpretation of the law. Thus, reversal or affirmance changes from court to court and from judge to judge.

The expansion of tort liability in most of its aspects has been a continuant in the 20th century. We should extend it to hospital liability. I would reverse and grant Mrs. Cooper a new trial.