[Civ. No. 22305.   Second Dist., Div. Two.   Oct. 15, 1957.]

AIDA MAYERS et al., Appellants, v. SIDNEY S. LITOW
et al., Respondents.

Robertson, Harney, Drummond & Dorsey and David M. Harney for Appellants.

Reed, Callaway, Kirtland & Packard, Dryden, Harrington, Horgan & Swartz and Vernon G. Foster for Respondents.

FOX, J.—This is an action by a husband and wife for damages predicated upon alleged malpractice arising out of a thyroidectomy performed on plaintiff wife by defendant Litow. The trial court granted judgments of nonsuit in favor of both the doctor and the hospital. Plaintiffs have appealed.

Mrs. Mayers first met Dr. Litow in 1951 when he performed a hysterectomy on her. In 1952 he removed her gall bladder. She had had a nodule on her neck for several years; however, she never experienced any trouble with her neck or throat. Upon examining her prior to the gall bladder surgery, Dr. Litow noticed the nodule ("a growth within the thyroid gland") on her neck and advised surgery. He was of the opinion that it was serious and required surgery since it was a "pre-malignant lesion." No contrary medical testimony on this point was produced by plaintiffs. Since the gall bladder surgery and the thyroid operation could not be undertaken at the same time, Dr. Litow decided to carry out the planned gall bladder operation first, and perform the other surgery after plaintiff had recuperated. He did not tell her that her ability to speak or breathe would be affected by the operation. Certain tests were made before the thyroid surgery.

Mrs. Mayers entered Midway Hospital for the thyroidectomy on September 30, 1952. She was examined by a medical student, who made notations on her hospital record concerning her physical examination and case history. Dr. Litow testified that he did not rely on this record in performing the operation. Dr. Litow was on the staff of the hospital and used it for many of his operations. He made the arrangements concerning Mrs. Mayers' time of admission and operation, leaving the financial arrangements with the hospital to be made by plaintiffs. This was the usual procedure.

Before the operation, at the request of Dr. Litow, Dr. Pies visited plaintiff wife at the hospital and examined her vocal cords. He found them to be normal in appearance and mobility. She was given sedatives in the evening and on the morning of the operation on October 1, 1952. Dr. Litow performed the operation with Dr. Feinstein assisting. The latter was engaged by Dr. Litow to assist in the operation. Dr.

Feinstein was also on the staff of the hospital. Both doctors testified that there was nothing unusual about this operation and that no complications were observed. The tumor in the thyroid gland was removed, and was later found not to be cancerous.

After the operation plaintiff wife complained of difficulty in speaking and breathing. Dr. Pies, plaintiffs' own witness, testified that he examined Mrs. Mayers two days after the operation. He found that the right vocal cord was normal, but that there was an impairment of the left cord of approximately 30 per cent. Mrs. Mayers denied having been examined by Dr. Pies at that time. She testified that she did not see him from the time of his visit before the operation until she went to his office for an examination in November. At that time he found there was no movement of the left vocal cord. He expressed the opinion that the change was due to the healing and "fibrosis." He was also of the opinion that the difficulty in breathing was not permanent and that her cold contributed to the condition.

In the weeks following the operation Mrs. Mayers went to see Dr. Litow several times. In response to her questions about her hoarseness, he said that it would go away. He sent her to Dr. Pies in November for the aforementioned examination. His main reason was that she had a bad cold and was having ear trouble, but he also wanted Dr. Pies to look at her vocal cords.

Mrs. Mayers went to several different doctors in the ensuing months. One of these was Dr. Wexler, who testified that he first examined her six months after the surgery. He found her left vocal cord to be totally paralyzed.

By the time of the trial Mrs. Mayers' condition was much improved. However, there was still a certain "stride" or noise in breathing and her voice was somewhat hoarse.

Much testimony was introduced at the trial concerning the recurrent laryngeal nerve. This nerve arises below the larynx and runs upward to the larynx, supplying the muscles which move the vocal cords.

Dr. Bellew examined Mrs. Mayers a few days before trial in 1956. Based upon a hypothetical question wherein it was assumed that there was *no* movement of the left cord after the operation, it was his opinion that the injury was caused by some severance of the nerve. He testified also concerning the present condition of Mrs. Mayers' left vocal cord and her hoarseness. He stated that the cord was "fixed in the midline, shortened and fibrotic."

All the medical experts seemed to agree that if the recurrent laryngeal nerve is severed, a complete paralysis of the vocal cord would immediately result. It was not disputed that it would not be common practice for a doctor to sever the recurrent laryngeal nerve during a thyroid operation.

Dr. Litow testified that he did not sever the recurrent laryngeal nerve during the surgery and Dr. Feinstein stated that he did not see Dr. Litow cut that nerve. The patient during surgery showed no signs that would indicate that the nerve had been severed, such as a rise in respiration or in temperature, difficulty in breathing, or an increased pulse rate. Dr. Litow testified also that edema might cause a paralysis but that function would ordinarily be restored unless fibrosis set in.

Plaintiffs relied also on certain admissions allegedly made to them by Dr. Litow to the effect that he was "sorry that it happened, he may have cut a nerve, because the nerves are very little. When you start to do anything it may happen in a thing like that."

Plaintiffs argue that (1) the nonsuit should not have been granted, (2) they were entitled to the application of the doctrine of res ipsa loquitur against both defendants, and (3) the trial court erred in excluding certain evidence.

█ A nonsuit should be granted only when, disregarding conflicting evidence and giving plaintiff's evidence all the value to which it is legally entitled, indulging in every legitimate inference that may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff. (*Raber* v. *Tumin*, 36 Cal.2d 654, 656 [226 P.2d 574].) █ In reviewing the evidence, "all presumptions, inferences and doubtful questions must be construed most favorably to the plaintiff." (*Hinds* v. *Wheadon*, 19 Cal.2d 458, 460 [121 P.2d 724].)

The judgment of nonsuit in favor of defendant Midway Hospital was patently correct. Defendant Litow performed the surgery with the assistance of Dr. Feinstein. No evidence was introduced to show that any other possible agents or employees of the hospital were present during the operation. These two doctors were both on the staff of defendant Midway Hospital; this meant that they were privileged to bring their cases to the hospital. █ Normally the question of agency is one of fact for the jury. (*Seneris* v. *Haas*, 45 Cal.2d 811,

831 [291 P.2d 915, 53 A.L.R.2d 124].) ▉ But in this case there is nothing in the record from which it may legitimately be inferred that defendant Litow or Dr. Feinstein was an agent or employee of the hospital. The doctors merely used the hospital facilities to perform the operation. It does not appear that they received any remuneration from the hospital for their services. Defendant Litow testified that he would arrange with the hospital for the use of facilities and would tell the patient to go to the hospital on the appointed day. Financial and other arrangements were thereafter made between the hospital and the patient. Mrs. Mayers had been operated upon previously in Midway Hospital; hence plaintiffs were familiar with the procedure and followed it on the occasion of the thyroid operation. It does not appear that defendant Litow ever did or said anything by which plaintiffs could reasonably infer that he was an agent of the hospital. It seems clear, therefore, that defendant Litow was in the position of independent contractor in regard to defendant Midway Hospital, and plaintiffs have failed to introduce evidence justifying an inference to the contrary. See *Ybarra* v. *Spangard*, 25 Cal.2d 486, 491 [154 P.2d 687, 162 A.L.R. 1258], holding that a surgeon was an independent contractor rather than an employee of the hospital, as an anesthetist or special nurse might be. Moreover, plaintiffs have presented neither argument nor authority to support their position on this point.

There is another theory upon which plaintiffs seek to hold the hospital liable. They base this claim of negligence upon the fact that plaintiff wife was examined by a medical student (when she entered the hospital) who gave her a cursory physical examination, took her case history, and made notations on her hospital record concerning these matters. Since it does not appear that defendant Litow even relied upon the hospital record in performing the operation, the acts of the medical student do not form any basis upon which it could be inferred that the hospital was causally connected with the injury, even if we assume that the notations made by the student were erroneous.

The plaintiffs base their claim of negligence on the part of defendant Litow upon two theories: (1) he was negligent in his diagnosis that Mrs. Mayers needed the operation, or (2) he was negligent in performing the operation. It is clear that there was insufficient evidence to support plaintiffs' first theory. Plaintiffs seem to place much weight on the fact that the nodule which defendant Litow removed from Mrs.

Mayers' neck was not cancerous. However, it was uncontradicted that there was no test known to determine in advance whether or not the growth was cancerous until it was taken out. Moreover, plaintiffs produced no medical testimony to contradict defendant Litow's diagnosis that the nodule was a "pre-malignant lesion" and that surgery was a reasonable safety measure.

 In support of their second theory of negligence plaintiffs introduced extensive evidence tending to show that Dr. Litow might have severed the recurrent laryngeal nerve during the operation. Since all the medical experts were of the opinion that this nerve should not be severed during the type of operation performed upon Mrs. Mayers, a severance of that nerve would indicate that the doctor failed to exercise reasonable care in performing the operation. If there was sufficient evidence indicating that Dr. Litow severed the nerve or that he otherwise failed to exercise reasonable care in performing the operation, then the case should have been allowed to go to the jury. (See *Raber* v. *Tumin, supra.*) Dr. Wexler was of the opinion that "there was undoubtedly some connection between the surgery and . . . the paralysis of the vocal cord." Dr. Bellew was of the opinion that the recurrent laryngeal nerve had been "severed or cut in half" in surgery. Both of these doctors first examined Mrs. Mayers many months after the operation and found a total impairment of the left vocal cord at that time; and both agreed that severance of the recurrent laryngeal nerve would produce immediate paralysis of the vocal cord, so that even partial movement of the cord after the operation would be inconsistent with a finding that the nerve had been severed. Dr. Pies, plaintiffs' own witness, testified that he examined Mrs. Mayers two days after the operation and that he found only a partial impairment of the cord at that time. However, Mrs. Mayers denied seeing Dr. Pies until more than a month after the operation. Since all doubtful questions must be resolved in favor of the plaintiffs (*Hinds* v. *Wheadon, supra*), this conflict must be disregarded. It is thus apparent that there was sufficient evidence to permit the case to go to the jury. This is fortified by the admission which defendant Litow allegedly made to plaintiffs.

In this connection plaintiffs argue also that they were entitled to an application of the doctrine of res ipsa loquitur.  "As a general rule, res ipsa loquitur applies where the accident is of such a nature that it can be said, in the

light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both upon common knowledge and the testimony of expert witnesses, and they have considered the circumstances relating to the accident in each particular case, such as the extent of control exercised by the defendant, the plaintiff's own conduct, the likelihood of negligence by some third person, and, in some situations, evidence that the defendant is better able than the plaintiff to explain what happened.'' (*Zentz* v. *Coca Cola Bottling Co.*, 39 Cal.2d 436, 446 [247 P.2d 344].) ■ ''The conclusion that negligence is the most likely explanation of the accident, or injury, is not for the trial court to draw, or to refuse to draw so long as plaintiff has produced sufficient evidence to permit the jury to draw the inference of negligence even though the court itself would not draw that inference; the court must still leave the question to the jury where reasonable men may differ as to the balance of probabilities [citation]. The inference of negligence is not required to be an exclusive or compelling one. It is enough that the court cannot say that reasonable men could not draw it. [Citation.] The existence of the conditions upon which the operation of the doctrine is to be predicated is a question of fact and the right of the jury to find those facts must be carefully preserved. [Citations.]'' (*Seneris* v. *Haas, supra*, p. 827.) The case of *Seneris* v. *Haas, supra*, is apposite here. In that case a husband and wife sued for personal injuries to the wife allegedly resulting from the negligent application of a spinal anesthetic injection given prior to the delivery of one of their children. The trial court ordered a nonsuit but the Supreme Court reversed, holding that the doctrine of res ipsa loquitur was applicable in light of the medical testimony which was introduced. ■ In the case at bar the medical testimony, when viewed most favorably to plaintiffs, raised a question of fact as to whether or not defendant Litow exercised reasonable care in conducting the operation upon Mrs. Mayers. ''We conclude, therefore, that plaintiffs' evidence is sufficient to submit to the jury, under proper instructions, the applicability of the rule of res ipsa loquitur.'' (*Seneris* v. *Haas, supra*, p. 827. See also *Ybarra* v. *Spangard, supra*, p. 494; *Milias* v. *Wheeler Hospital*, 109 Cal.App.2d 759, 764 [241 P.2d 684]; Prosser, *Res Ipsa Loquitur in California*, 37 Cal.L.Rev. 183, 194-195.)

Plaintiffs' next contention is that the trial court erred by refusing to permit them to examine Dr. Pies "as if under cross-examination" pursuant to Code of Civil Procedure, section 2055. The court in effect ruled that Dr. Pies was not the agent or employee of either defendant, and plaintiffs could examine him only as their witness. Since this question may arise again upon a retrial, we deem it appropriate to pass on it for the court's guidance.

Dr. Pies was called in by Dr. Litow to examine Mrs. Mayers before the operation. The record discloses no connection whatsoever between Dr. Pies and Midway Hospital, so he was clearly not the agent or employee of that defendant. Nor does he appear to have been an agent or employee of defendant Litow. The fact that he was called in by defendant Litow and the fact that he and Litow referred many cases to each other do not in themselves establish an agency or employee relationship. It does not appear that Dr. Litow compensated Dr. Pies for his services; Dr. Pies was not subject to Dr. Litow's control during the former's examinations of Mrs. Mayers. Dr. Litow did not do or say anything which would permit plaintiffs reasonably to assume that Dr. Pies was his employee or agent. The relationship between one physician and another who is called in on a case by the former is typically that of independent contractors. (See *Ybarra* v. *Spangard, supra,* p. 491.) The plaintiffs in the case at bar have failed to produce evidence establishing the contrary.

Plaintiffs' final contention is that the trial court erroneously refused them the right to cross-examine defendant Litow concerning the entries made in the hospital record by the medical student who examined Mrs. Mayers when she entered the hospital. Plaintiffs' theory is that the evidence expected to be adduced is relevant to show either that the medical student employed by the hospital erroneously diagnosed Mrs. Mayers' condition (thereby tending to establish liability of defendant Midway Hospital), or, alternatively, that defendant Litow erroneously diagnosed her condition (thereby tending to establish liability of defendant Litow). As was previously pointed out, Dr. Litow did not rely on the hospital record in performing the operation. Plaintiffs' cause of action is based on alleged negligence during the course of the operation. There appears to be no causal connection between her injury and what was written on her hospital

record by the medical student. Therefore, the line of questioning was irrelevant and immaterial as to both defendants.

The judgment in favor of defendant Midway Hospital is affirmed; the judgment in favor of defendant Litow is reversed.

Moore, P. J., and Ashburn, J., concurred.