ERVIN, Judge,
concurring and dissenting.
The Burroughs appeal an order granting summary judgment on behalf of defendants Alachua General Hospital and Dr. Herbert Wagemaker. On February 8,1973, an automobile driven by Mrs. Burroughs was struck by a car operated by Grace Willard. Eleven days before the accident, Mrs. Willard had been admitted as a voluntary patient under the Baker Act to the psychiatric ward of Alachua General Hospital to be treated for alcoholism and depression. She was placed on several medications including Elavil and Librium. On February 8, 1973, her treating physician, Dr. Wagemaker, issued a pass permitting her to leave the hospital in order to drive approximately 100 miles to Daytona Beach in an effort to enter a drug rehabilitation center located there. On her return trip to Gainesville, Mrs. Willard became disoriented and confused; her car crossed the median line of a state highway, and the collision resulted. The Burroughs sued Dr. Wagemaker and the hospital for negligently releasing Mrs. Willard, alleging they knew or should have known she was at the time unable to operate an automobile.
The defendants moved twice for summary judgment. The first motion was denied and its denial was based apparently upon the affidavit of Dr. Robert G. Head in which he expressed the opinion that the procedure employed in releasing Mrs. Willard on pass to drive 100 miles unescorted violated acceptable standards of psychiatric treatment. Following the execution of the affidavit, Dr. Head notified the Burroughs’ attorney he would be unable to be deposed for the plaintiffs because officers in the medical society had advised him that he may have acted unethically in giving his prior affidavit “and may [have been] subject to censure” for the manner in which his statement was given. Later, Dr. Head submitted a second sworn statement, stating that having reviewed other medical records and the depositions of a social worker and nurse, it was his opinion that Dr. Wage-maker’s treatment met or exceeded the standards of the community in which it was *DCCCLXXXIII given. Following his second contradictory opinion, summary judgment was granted in favor of defendants.
Because expert testimony “is generally regarded as essential where the action is based on the failure to exercise due professional skill and care . . . ”, 2 Jones on Evidence, § 14:9, page 608 (6th ed. 1972), the trial judge apparently found that appellants’ lack of any evidence on that subject was fatal to the Burroughs’ case. While it is true that a trial court has a right to consider successive motions for summary judgment when additional proofs are relied upon by the moving party, Unger v. Bergness, 172 So.2d 627 (Fla.3d DCA 1965); Cahill v. Cooney, 182 So.2d 32 (Fla.3d DCA 1966), it is unclear how the additional material relied upon by Dr. Head led to any deviation from his earlier opinion. For example, the depositions of the case worker and the registered nurse do not contradict the facts recited in Dr. Head’s prior affidavit, to the effect that the day before Mrs. Willard was released from the hospital, she had been extremely ill and, the next day, when she was given the pass, she was administered Elavil and Librium and permitted to drive 100 miles by herself. The other medical records referred to in the later affidavit relate generally to hospitalizations of Mrs. Willard occurring before and after her admission to the hospital on January 28, 1973, and do not disclose, by themselves, how they affected Dr. Wagemaker’s opposite conclusion.
In 2 Jones on Evidence, supra, § 14:19, at p. 635, it is stated:
The probative value of expert opinion testimony depends on a number of considerations — the comprehensiveness of the factual information utilized by the expert, the extent to which the facts upon which he relies are believed by the trier of facts to be true, and the reasonableness of the conclusions drawn as they appear to the fact-finder. To persuade the jury or the trial judge of the reasonableness of the opinion the witness must be able to give persuasive reasons for his conclusions, so, in testifying, the witness should ordinarily give his reasons upon which his conclusions are based.
Expert witnesses are also subject to cross-examination like other witnesses and should be asked “whether they have not on other occasions expressed opinions different from those given on the stand . . .,” and asked to give reasons for the change of opinion. Id. at § 14.30.
This case appears to be similar to Andrews v. Midland National Insurance Co., 208 So.2d 136 (Fla.3d DCA 1968), cert, den., Fla., 212 So.2d 878. There, a passenger in an automobile operated by one Wilson, and owned by Reynolds, sought uninsured motorist’s benefits from the owner’s insurer for injuries received by her after she was involved in a collision with an uninsured automobile. The insurer denied coverage because the driver allegedly had operated the car without permission of the owner. Two conflicting affidavits were obtained from the owner. The first stated that the driver had no permission to operate his car, while the second stated that she did in fact have such permission. The trial court entered summary judgment for the insurer, holding that the owner, having given the first affidavit upon which the insurer relied, could not later give a contrary affidavit which had the effect of creating a factual issue for the passenger. In reversing summary judgment, the court observed that while the affidavits were diametrically opposed, they contained no factual representations, only conclusions. It continued:
We think that at the danger of prolonging litigation, we must hold that a witness is not irrevocably bound by his first written statement upon the issues of a case. It is proper for the court to require further evidence on the issue. Such evidence may be by discovery and a further motion for summary judgment or by a reservation of the cause for trial. Id. at 137.
Not only did Dr. Head fail to explain adequately his change of opinion in the second affidavit, his motives in its execution are suspect since he had earlier announced his intention to withdraw from *DCCCLXXXIV further participation in the case due to the fear he may have acted unethically by not first submitting his opinion to the malpractice panel. The parties, at the very minimum, should have been given the opportunity to examine Dr. Head in an effort to determine the extent, if any, his second opinion was compromised by threats of censure from the medical community.[1]
I think, under the circumstances, this court should reverse the summary judgment entered for Dr. Wagemaker and remand the case for further proceedings, including either additional discovery or setting the case for trial.
Dr. Wagemaker argues also that since Mrs. Willard was admitted to the hospital as a voluntary Baker Act patient, she was free to leave at any time. This is an incorrect statement of the law. A Baker Act patient may be discharged only after he has complied with certain prescribed conditions. See Section 394.465(2), Florida Statutes (1971).
I agree that the lower court properly entered summary judgment in favor of Ala-chua General Hospital. The determination of the hospital’s liability turns on whether the nurse, Joann Eckler, acted as the hospital’s agent or as the agent of the doctor, and on whether Dr. Wagemaker himself was an agent of the hospital in performing or assisting in the allegedly negligent acts. The record shows that Dr. Wagemaker was employed by the North Central Florida Community Mental Health Center, a local institution treating indigent individuals, and that he was also chief of staff in psychiatry at the defendant hospital. The record also shows that inpatients of the mental health center, when admitted to the hospital under the Baker Act, are completely under the care of Dr. Wagemaker or another employee doctor of the center. The appellants presented no evidence showing that Dr. Wagemaker acted in any capacity other than as an independent contractor or that the allegedly negligent acts complained of were not simply professional decisions of Grace Willard’s private physician, not subject to any control by the defendant hospital.
In the normal situation where a sick or injured person consults his own doctor for diagnosis and treatment, and the latter recommends hospital care, the hospital to which the patient is admitted is not liable for the doctor’s misconduct resulting in injury to the patient, even though such misconduct takes place at the hospital, and even though certain other links between the hospital and the doctor, such as the circumstance that the latter is on the former’s “staff” may exist. Annotation, 69 A.L.R.2d 305, 309 (1960).
See also Wilson v. Lee Memorial Hospital, 65 So.2d 40 (Fla.1953) (where summary judgment in favor of the hospital was reversed because conflicting affidavits left a question of fact as to whether the nurse and surgeon were agents of the hospital); Mayers v. Litow, 154 Cal.App.2d 413, 316 P.2d 351 (1957); Pikeville Methodist Hospital v. Donahoo, 221 Ky. 538, 299 S.W. 159 (1927); Naddeo v. Degenshein, 147 N.Y.S.2d 586 (N.Y.Sup.Ct.1955).
The acts of the nurse upon which liability is alleged to exist were not the acts of an agent of the hospital, so that the hospital is not liable through her on respondeat superi- or. Compare Buzan v. Mercy Hospital, 203 So.2d 11, 13 (Fla.3d DCA 1967), where the surgical nurse who incorrectly counted the sponges during the plaintiff’s operation was acting as the hospital’s agent in that capacity because “[fjurnishing proper personnel and equipment for an operation are duties of a hospital,” and the nurse was acting under orders of the hospital, not “under the orders of [the] private physician in matters involving professional skill and decision . .” Here Eckler was acting under Dr. Wagemaker’s orders in administering a drug to Grace Willard and in assisting her temporary release from the hospital. Such *DCCCLXXXV actions were direct results of Dr. Wage-maker’s professional decisions and had nothing to do with the ministerial, administrative duties of the hospital.
I would reverse the summary judgment as to Dr. Wagemaker and affirm it as to the hospital.

. Parenthetically, before Dr. Head signed the second affidavit, he failed to appear at a scheduled deposition, although he had been served with a subpoena by defendants. Defendants moved to have him cited for contempt, which was never acted upon by the court. Two months after the motion was filed, Dr. Head executed his recanting affidavit.