Filed 8/8/22; Certified for Publication 8/22/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MICHAEL FRANKLIN, | 2d Civil No. B311482 |
| | (Super. Ct. No. 16CV01531) |
| Plaintiff and Appellant, | (Santa Barbara County) |
| v. | |
| SANTA BARBARA COTTAGE HOSPITAL, | |
| Defendant and Respondent. | |

The issue in this appeal is whether respondent Santa Barbara Cottage Hospital (Hospital) can be held liable for the alleged negligence of its staff physician, Dr. John Park. Dr. Park's patient, Michael Franklin, appeals from the judgment entered after the trial court granted Hospital's motion for summary judgment. Appellant claimed that Dr. Park had negligently injured him during surgery performed at Hospital. Appellant settled his malpractice action against Dr. Park for $1 million, the maximum coverage under Dr. Park's professional liability insurance policy. Based on actual agency and ostensible

agency theories, appellant sought to hold Hospital vicariously liable for Dr. Park's negligence. We affirm the judgment in Hospital's favor.

*Factual and Procedural Background*

Hospital "is a nonprofit public benefit corporation." In March 2013 Hospital, Dr. Park, and Neurological Surgery of Santa Barbara, Inc. (Neurological Surgery), entered into a "Physician Recruitment Agreement." Dr. Park signed the agreement on behalf of Neurological Surgery. The agreement stated, "It is the current understanding of the parties that [Dr. Park] will establish [a neurosurgical oncology] practice as an employee of [Neurological Surgery] and will provide services at Hospital . . . ." Dr. Park will "join Hospital's medical staff" and "establish a new private medical practice with [Neurological Surgery] in the Geographic Area" served by Hospital.[1] In a section entitled "Independent Contractor," the agreement provided: "No relationship of employer and employee or joint venturers or partners between [Dr. Park] and Hospital or [Neurological Surgery] and Hospital is created by this Agreement. In performing the rights and duties identified in this Agreement, the parties are acting as independent contractors. In no event shall Hospital have or exercise control over the manner

---

[1] "A 'staff physician' is one who has been accorded 'staff privileges' at a hospital . . . . A physician must be a member of a hospital's medical staff to admit patients to that hospital." (*Clarke v. Hoek* (1985) 174 Cal.App.3d 208, 211, fn. 1; see also *Mayers v. Litow* (1957) 154 Cal.App.2d 413, 417 ["These two doctors were both on the staff of defendant Midway Hospital; this meant that they were privileged to bring their cases to the hospital"].)

in which [Dr.Park] provide[s] professional services or other services required by this Agreement."

Dr. Cecilia O'Dowd, appellant's primary care physician, treated him for back pain. A magnetic resonance imaging (MRI) scan showed that appellant had a herniated disc. Dr. O'Dowd referred appellant to Dr. Park for further treatment.

Appellant looked up Dr. Park on the internet. The first article he found was a "Noozhawk article" about him.[2] The article was dated November 15, 2013. It was written by "Maria Zate[,] . . . the manager of marketing and public affairs for Cottage Health System."[3] (Italics omitted.) The article said that Dr. Park, "[a] board-certified neurosurgeon," had "joined the Santa Barbara Neuroscience Institute [(Institute)] at Cottage Health system." The article included a quotation from Dr. Thomas Jones, the medical director of the Institute. Dr. Jones said, "'The physicians and neurosurgeons of the . . . Institute in collaboration with Cottage Health System have . . . recruit[ed] a top-tier neurosurgeon and scientist with a subspecialty expertise in the treatment of brain tumors . . . .'"

Appellant declared, "Based on my [internet] research including numerous webpages from Cottage's website that

---

[2] We take judicial notice that noozhawk.com is a website that provides news and information about Santa Barbara County. (Evid. Code, §§ 452, subd. (h), 459.)

[3] We take judicial notice that "Cottage Health is a not-for-profit hospital system that includes Santa Barbara Cottage Hospital [and other medical facilities] . . . ." <https://www.cottagehealth.org> [as of Apr. 6, 2022], archived at <https://perma.cc/3EGZ-KF6W>. (Evid. Code, §§ 452, subd. (h), 459.)

featured Dr. Park I thought that Dr. Park worked for and was part of Cottage Hospital."  But in his opposition to another defendant's motion for summary judgment in the same lawsuit, appellant declared, "Before retaining counsel to bring this suit, I had never thought about and had no information regarding what the legal relationship was between Dr. Park and . . . [Hospital] . . . ."

Dr. Park's office was in a building across the street from Hospital.  On January 8, 2015, appellant saw Dr. Park at his office.  Dr. Park wrote in his notes:  "[Appellant] appears to have right leg pain due to a large right paracentral L5-S1 disc herniation.  Because he does not currently have any weakness or numbness and given his young age [37 years old], I recommended that he try a course of physical therapy in an effort to avoid surgery."  Based on his visit to Dr. Park's office, appellant believed that Dr. Park was "part of a group" but he "didn't know the name of the group."

On January 14, 2015, appellant saw Dr. Park again at his office.  Dr. Park "recommended that [appellant] undergo a right L5-S1 discectomy."  Appellant agreed to the surgical procedure.  But his insurance company refused to authorize the surgery.  Appellant understood that the insurance company "did not think I had done enough in the way of preventative measures, like enough physical therapy or other treatments, to warrant surgery."

According to appellant, his back condition "was getting worse."  His wife telephoned Dr. Park's office.  Dr. Park said that, if appellant would come to Hospital's emergency room (ER) on Friday morning, January 30, 2015, "[Dr. Park] would be able to do the surgery that day."  Appellant understood that he "had to

4

go through the ER in order to expedite getting the surgery performed."

In her deposition appellant's wife testified: "[Dr. Park] told us to go to the emergency room on January 30th because he would be on call and can do the surgery then." "So we didn't go to the ER because of worsening pain. We went to the ER because Dr. Park told us to go . . . . And that's how we could get insurance to pay for the surgery."

As directed by Dr. Park, appellant went to the ER on Friday morning, January 30, 2015. Nursing staff reported that, although appellant "appears[] **in distress due to pain**," he is "cooperative, alert. Oriented to person, place and time . . . ."

Appellant signed a three-page consent form authorizing the surgery. The form consisted of 16 paragraphs. The third paragraph was entitled, "**Legal Relationship Between Hospital and Physicians**." The paragraph stated, "All physicians and surgeons providing services to me . . . are not employees or agents of the hospital . . . . They have been granted the privilege of using the hospital for the care and treatment of their patients . . . ." Except for the title, nothing about the third paragraph distinguished it from the other 15 paragraphs.

Appellant declared: "I only have a vague recollection of the Cottage [Hospital] person coming to my bedside [at the ER before the surgery] and discussing [the consent form] . . . . At that time, I was in so much pain and anxious to get the surgery approved . . . that my only thought was to do whatever was necessary to proceed." "The only subjects I recall going over were the financial arrangements and that I was consenting to have surgery with Dr. Park."

Rosa Pinedo was a patient financial counselor at Hospital. She witnessed appellant's signing of the consent form, but she had no recollection of appellant. She testified that, before a patient signed the form, she would tell the patient "[t]hat the physician that is treating the patient is not a Cottage Hospital employee. They are independent contractors that have privileges here at the hospital."

In opposition to the motion for summary judgment, appellant submitted the declaration of Dr. Joshua Prager, who specializes in pain medicine and complex pain syndromes. Dr. Prager declared: "As a result of [appellant's] severe pain in addition to the medications he was previously taking and those administered in the emergency room shortly before he was presented with the [consent] form, it is my opinion, to a reasonable degree of medical certainty that he would have had significant difficulty in concentrating upon reading the documents, and understanding and appreciating the significance of the content of the form. It would be especially difficult to comprehend the complex legal discussion in the provision addressing the legal relationship between the hospital and the physicians." "A patient in extremis will do anything in his/her means to receive treatment, including signing documents without comprehending them."

Hospital records show that at 9:29 a.m. appellant's pain level was a "10." But at 10:10 a.m. his pain level had declined to a "2." The consent form was signed at 10:45 a.m.

During the surgery, an "unintended durotomy" occurred. It was "likely caused by puncture of the lateral thecal sac with [a] probe." After the surgery, appellant developed serious neurological problems allegedly caused by the durotomy.

*Trial Court's Summary Judgment Ruling*

The trial court ruled that Dr. Park was not Hospital's actual agent. The court explained, "Because [Hospital] did not control the course of treatment rendered by Dr. Park in this case, [Hospital] cannot be held liable for Dr. Park's alleged negligence. . . . Dr. Park's status as a member of [Hospital's] medical staff does not compel the conclusion that he was an agent or employee of [Hospital] . . . ."

As to whether Dr. Park was Hospital's ostensible agent, the trial court ruled that there was no triable issue of material fact because appellant had been "treated by his personally selected physician, not by someone chosen by Hospital." Furthermore, appellant failed to show that he had relied on the allegedly ostensible agency relationship between Hospital and Dr. Park.

*Law of Summary Judgment and Standard of Review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A triable issue of material fact exists only if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra,* at p. 850, fn. omitted.)

A defendant moving for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of

7

action' in question 'cannot be established,' or that 'there is a complete defense' thereto. [Citation.]" (*Aguilar, supra,* 25 Cal.4th at p. 850; see also Code Civ. Proc., § 437c, subd. (p)(2).) The defendant also "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar, supra,* at p. 850.) Where, as here, the burden of proof at trial is by a preponderance of the evidence, the defendant must "present evidence that would require such a trier of fact *not* to find any underlying material fact more likely than not." (*Id.,* at p. 845.) If the defendant carries this burden, the burden of production shifts to the plaintiff "to make a prima facie showing of the existence of a triable issue of material fact." (*Id.,* at p. 850.) The plaintiff must present evidence that would allow a reasonable trier of fact to find the underlying material fact more likely than not. (*Id.,* at p. 852.)

On appeal we conduct a de novo review, applying the same standard as the trial court. (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064.) Our obligation is "'"to determine whether issues of fact exist, not to decide the merits of the issues themselves. . . ."'" (*Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1228.) We must "'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar, supra,* 25 Cal.4th at p. 843.)

"We must presume the judgment is correct . . . ." (*Jones v. Department of Corrections and Rehabilitation* (2007) 152 Cal.App.4th 1367, 1376.) "'As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate

error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. . . .' [Citation.]" (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230.)

*Actual Agency*

"An agent is one who represents another, called the principal, in dealings with third persons.  Such representation is called agency."  (Civ. Code, § 2295.)  "An agency is either actual or ostensible." (*Id.*, § 2298.)  "'A hospital is liable for a physician's malpractice when the physician is actually employed by or is the ostensible agent of the hospital.'" (*Whitlow v. Rideout Memorial Hospital* (2015) 237 Cal.App.4th 631, 635.)

"An agency is actual when the agent is really employed by the principal."  (Civ. Code, § 2299.)  For an actual agency to exist, "'[t]he principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control.'  [Citation.]  In the absence of the essential characteristic of the right of control, there is no true agency and, therefore, no 'imputation' of the [alleged agent's] negligence to the [alleged principal].  [Citations.] . . . 'The doctrine of *respondeat superior* sought here to be invoked . . . must necessarily be based upon a relationship between two parties by which one has the legal right to direct the activities of the other and the latter the legal duty to submit to such direction.'" (*Edwards v. Freeman* (1949) 34 Cal.2d 589, 592.)

By producing the "Physician Recruitment Agreement" between Hospital and Dr. Park, Hospital satisfied its initial burden of production as well as its burden of persuasion for summary judgment purposes.  The agreement provided that there is no employer-employee relationship between Dr. Park and

9

Hospital, that Dr. Park is an independent contractor, and that Hospital shall not "have or exercise control over the manner in which [Dr.Park] provide[s] professional services or other services required by this Agreement."

Thus, the burden shifted to appellant "to make a prima facie showing of the existence of a triable issue of material fact" as to the existence of an actual agency relationship. (*Aguilar, supra,* 25 Cal.4th at p. 850.) In his opening brief appellant states, "It is admitted that Dr. Park was not employed by [Hospital], but was rather an independent contractor." Nevertheless, appellant claims that Dr. Park was Hospital's agent because, "based on its contractual authority, [Hospital] exercised control over how Dr. Park was allowed to practice in numerous ways which a hospital does not control staff physicians in normal circumstances: (1) It dictated how much vacation he could take and limited how much time he could take off for continuing education; (2) It dictated that he must treat certain types of patients including Medicare and those having insurance with companies Cottage [Hospital] had contracted with; (3) It dictated what charities he must support; (4) It dictated the time he must be on emergency call and how fast he must arrive after being called; and, (5) It dictated that he must spend 24 hours a month on services as the Director of the Neurosurgical Oncology Program."

The above five examples of Hospital's alleged control over Dr. Park have nothing to do with his medical treatment of patients. The issue is whether appellant carried his burden of presenting evidence that would allow a reasonable trier of fact to find that Hospital "had the right to control the manner and means of Dr. [Park's] treatment of [appellant]." (*Jackson v. AEG*

10

*Live, LLC* (2015) 233 Cal.App.4th 1156, 1179.)  Hospital "never instructed Dr. [Park] on how to treat [appellant], and no evidence was presented that [Hospital] had the right to control Dr. [Park's] treatment of [appellant]." (*Ibid*.)  In his reply brief appellant alleges, "Because of the extent of [Hospital's] control over Dr. Park's practice of medicine, *except for how he actually treated patients*, Dr. Park was an actual agent of [Hospital]." (Italics added.)  Accordingly, summary judgment was properly granted as to appellant's claim of actual agency.

*Ostensible Agency*

"An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him."  (Civ. Code, § 2300.)  "Ostensible agency . . . '"may be implied from the facts of a particular case, and if a principal by his acts has led others to believe that he has conferred authority upon an agent, he cannot be heard to assert, as against third parties who have relied thereon in good faith, that he did not intend to confer such power . . . .'"  [Citation.]  'The doctrine establishing the principles of liability for the acts of an ostensible agent rests on the doctrine of estoppel [citation].  The essential elements are representations by the principal, justifiable reliance thereon by a third party, and change of position or injury resulting from such reliance [citation]. . . .'" (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 502.)

"[A]lthough a hospital may not control, direct or supervise physicians on its staff, a hospital may be liable for their negligence on an ostensible agency theory, unless (1) the hospital gave the patient actual notice that the treating physicians are not hospital employees, and (2) there is no reason to believe the

11

patient was unable to understand or act on the information, *or* (3) the patient was treated by his or her *personal physician* and knew or should have known the true relationship between the hospital and physician." (*Wicks v. Antelope Valley Healthcare District* (2020) 49 Cal.App.5th 866, 884, italics added; see also *Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1038 (*Markow*), italics added ["'unless the patient had some reason to know of the true relationship between the hospital and the physician—i.e., because the hospital gave the patient actual notice or *because the patient was treated by his or her personal physician*—ostensible agency is readily inferred'"].)

For summary judgment purposes, Hospital satisfied its initial burden of production as well as its burden of persuasion that Dr. Park was not its ostensible agent. Dr. Park was appellant's personal physician. Appellant's primary physician referred appellant to Dr. Park, not to Hospital. Appellant twice consulted Dr. Park at his office. Appellant chose Dr. Park to perform the surgery. Hospital did not choose Dr. Park. After appellant's insurance company refused to authorize the surgery as an elective procedure, Dr. Park personally arranged for the surgery to be performed as an emergency procedure so it would be covered by appellant's insurance. Hospital was not aware of and did not agree to this arrangement.

At the emergency room before the surgery, appellant signed a consent form expressly stating that the physicians providing services to appellant are not Hospital's agents or employees. A witness to appellant's signing of the form routinely informed patients that physicians are not Hospital's employees but instead are independent contractors. Nursing staff in the emergency room noted that appellant was "alert" and "[o]riented to person,

12

place and time." Hospital records show that, before he signed the consent form, appellant reported that his pain level was a "2" out of a possible "10." It is reasonable to infer that a "2" level of pain would not have interfered with his ability to understand the content of the form.

Moreover, appellant declared under penalty perjury, "Before retaining counsel to bring this suit, I had never thought about and had no information regarding what the legal relationship was between Dr. Park and . . . [Hospital] . . . ." Appellant's statement indicates that he did not rely on the existence of an agency relationship between Hospital and Dr. Park.

Thus, the burden shifted to appellant "[to] present evidence that would allow a reasonable trier of fact to find in his favor on the [ostensible agency] issue by a preponderance of the evidence, that is, to find an [ostensible agency relationship between Hospital and Dr. Park] more likely than not." (*Aguilar*, *supra*, 25 Cal.4th at p. 852.)

Appellant presented the opinion of Dr. Prager that, because of appellant's pain and the drugs he had been administered in the emergency room, appellant would "have had significant difficulty in concentrating upon reading the [consent form], and understanding and appreciating the significance of the content of the form." Appellant argues that Dr. Prager's opinion and other evidence "create a triable issue of material fact regarding [appellant's] ability to understand and appreciate the significance of the legalese disclaimer contained in the [consent form]." In addition, appellant contends that the form "does not meet California's standard for it to be a viable release of [Hospital's] liability." (Bold and italics omitted.)

We need not decide these issues. Appellant cannot defeat the motion for summary judgment by showing that he did not understand the consent form's release language or that the form did not comply with California's standards for a release of liability. If we disregard the consent form, appellant still has failed to make a prima facie showing of the two essential elements of ostensible agency: "'(1) conduct by the hospital that would cause a reasonable person to believe that the physician was an agent of the hospital, and (2) reliance on that apparent agency relationship by the plaintiff.'" (*Markow*, *supra*, 3 Cal.App.5th at p. 1038.) In his reply brief, appellant acknowledges that this "two prong test [is] uniformly followed by California Courts regarding the elements necessary for proving ostensible agency."

With respect to the first element concerning conduct by the hospital, appellant claims that "[his] reasonable belief that Dr. Park was [Hospital's] agent was . . . based upon: (1) [Hospital's] public communications about the doctor's being a part of [Hospital] and its Neuroscience Institute; (2) The fact that Dr. Park was housed in a building for [Hospital] physicians, located directly across the street from the hospital; (3) The fact that Dr. Park did not have his own website and he was conspicuously present on [Hospital's] website as if he was a [Hospital] doctor; and, later, (4) The fact that neither [Hospital] nor Dr. Park publicly said anything to contradict that information that they put out publicly inferring that Dr. Park was part and parcel of [Hospital]."

As to Hospital's public communications concerning its relationship with Dr. Park, appellant relies in part on the November 15, 2013 Noozhawk article announcing that Dr. Park

14

"has joined the Santa Barbara Neuroscience Institute [(Institute)] at Cottage Health System."  But the article did not imply that, by "joining" the Institute, Dr. Park had become Hospital's employee or agent.

Appellant claims in conclusionary language that he and his wife "looked at several pages of Cottage's website, which indicated that Cottage Hospital was part of Cottage Health and that Dr. Park was a Cottage Hospital physician."  In support of his claim, appellant refers us to evidentiary exhibits consisting of web pages from Cottage Health's website.  The web pages were downloaded in 2020.  Assuming that appellant and his wife viewed the same or similar webpages when they did research on Dr. Park before seeing him in January 2015, the webpages should have alerted them that Dr. Park was not an agent or employee of Hospital.

Exhibit 13 is a webpage showing that Dr. Park is "[c]redentialed" at Hospital and joined its staff in 2013.  Pursuant to Evidence Code sections 452, subdivision (h) and 459, we take judicial notice that "[h]ospital credentialing . . . is the process of verifying that a provider is qualified to provide medical services" <https://verisys.com/what-is-hospital-credentialing/ [as of Apr. 6, 2022], archived at <https://Perma.cc/643Q-NRD6>.  "A physician is not an agent of a hospital merely because he or she is on the medical staff of the hospital." (*Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88, 104.)

The webpage shows that Dr. Park's office is not located at Hospital, but instead at "Neurological Surgery of Santa Barbara, Inc. [(Neurological Surgery),] 2410 Fletcher Ave., 3rd Floor[,] Santa Barbara."  A reasonable person viewing the webpage would infer that Dr. Park was an employee of Neurological Surgery, not

15

Hospital.  This accords with the 2013 Physician Recruitment Agreement entered into between Hospital, Dr. Park, and Neurological Surgery.  The agreement provides, "It is the current understanding of the parties that [Dr. Park] will establish [his] practice as an employee of [Neurological Surgery] . . . ."

Exhibit 14 is a Cottage Health webpage listing Hospital physicians.  Dr. Park's name is followed by "Neurological Surgery of Santa Barbara, Inc."  A person viewing this page would also reasonably infer that Dr. Park was employed by Neurological Surgery, not Hospital.

"[T]hat Dr. Park was housed in a building for [Hospital] physicians, located directly across the street from the hospital," is not determinative.  It is common knowledge that physicians on the staff of a hospital often lease office space in medical buildings close to the hospital.  Furthermore, an ostensible agency relationship cannot be based on where Dr. Park decided to locate his office.  "'Ostensible agency cannot be established by the representations or conduct of the purported agent [Dr. Park]; the statements or acts of the principal [Hospital] must be such as to cause the belief the agency exists.'" (*American Way Cellular, Inc. v. Travelers Property Casualty Co. of America* (2013) 216 Cal.App.4th 1040, 1053.)

"[T]hat Dr. Park did not have his own website and he was conspicuously present on [Hospital's] website" is also meaningless.  It is common knowledge that Hospital websites often list staff physicians.  Thus, appellant failed to make a prima facie showing of the first essential element of ostensible agency – "'conduct by the hospital that would cause a reasonable person to believe that the physician was an agent of the hospital . . . .'" (*Markow, supra,* 3 Cal.App.5th at p. 1038.)

16

As to the second essential element of ostensible agency – reliance on the apparent agency relationship – appellant admitted that, until he retained counsel, he "had never thought about and had no information regarding what the legal relationship was between Dr. Park and . . . [Hospital] . . . ." In addition, appellant did not look to Hospital for surgical services. Instead, he looked to his personal physician, Dr. Park, whom he had selected to perform the surgery. "Reliance upon an apparent agency is demonstrated 'when the plaintiff "looks to" the hospital for services, rather than to an individual physician.'" (*Markow*, *supra*, 3 Cal.App.5th at p. 1038.)

Our analysis is supported by *Magallanes de Valle v. Doctors Medical Center of Modesto* (2022) 80 Cal.App.5th 914. There, the court held that the doctor (Dr. Brock) who had performed surgery on the plaintiff (Magallanes) was not the ostensible agent of the hospital because Magallanes had selected Dr. Brock as her personal physician: "Magallanes, a preexisting patient of Dr. Brock, did not rely on an apparent agency relationship between [hospital] and Dr. Brock in seeking and receiving surgical care from Dr. Brock. Rather, Magallanes, herself chose Dr. Brock as her treating physician and elected to undergo the procedure at issue under the guidance of Dr. Brock and on the condition that it would be performed by Dr. Brock. These undisputed facts conclusively establish that, under the circumstances, Magallanes *reasonably should have known* that Dr. Brock was not an agent of the hospital; rather, [Dr. Brock] utilized the hospital's surgical facilities to provide surgical care to her own patients." (*Id*. at p. 924.)

Because appellant failed to carry his burden "to make a prima facie showing of the existence of a triable issue of material

17

fact" as to ostensible agency, summary judgment was properly granted on the ostensible agency claim. (*Aguilar, supra,* 25 Cal.4th at p. 850.)

*Disposition*

The judgment is affirmed. Hospital shall recover its costs on appeal.


YEGAN, J.

We concur:


GILBERT, P. J.


PERREN, J.

Colleen K. Sterne, Judge

Superior Court County of Santa Barbara

_____

Biren Law Group and Matthew B.F. Biren, John A. Roberts, for Plaintiff and Appellant.

Horvitz & Levy and H. Thomas Watson, Steven S. Fleischman; Clinkenbeard, Ramsey, Spackman & Clark and William Clinkenbeard, Maureen E. Clark, Cathy Anderson, for Defendant and Respondent.

Filed 8/22/22

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MICHAEL FRANKLIN,<br><br>  Plaintiff and Appellant,<br><br>v.<br><br>SANTA BARBARA COTTAGE HOSPITAL,<br><br>  Defendant and Respondent. | 2d Civil No. B311482<br>(Super. Ct. No. 16CV01531)<br>(Santa Barbara County)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on August 8, 2022, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

Gilbert, P.J.        Yegan, J.        Perren, J.*

* Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.